**PFOHL BROTHERS LANDFILL SITE STEERING COMMITTEE,**
Plaintiff,

v.

**ALLIED WASTE SYSTEMS, INC. and GSX Polymers, Inc., Defendants.[1]**

No. 95–CV–956A.

United States District Court,
W.D. New York.

March 27, 2003.

Forge Company, Buffalo Pumps, Inc., Pratt & Lambert, Inc., William A. Pfohl, Jacqueline Pfohl–Doherty, Janine Pfohl, Mary Pfohl–Andrade, Q–X Ranch Partnership and unidentified Jane and John Does.

138

Stephens & Stephens, R. Williams Stephens, of Counsel, Buffalo, for Plaintiff.

Beveridge & Diamond, P.C., James B. Slaughter, Gary J. Smith and Daniel M. Krainin, of Counsel, Washington, DC, for Plaintiff.

Webster, Szanyi, LLP, Nelson Perel and A. Timothy Webster, of Counsel, Buffalo, NY, for Defendants Allied Waste Systems, Inc. and GSX Polymers, Inc.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28

U.S.C. § 636(b)(1), on February 9, 1996. On May 15, 2001, plaintiff Pfohl Brothers Landfill Steering Committee filed a motion for partial summary judgment and defendants Allied Waste Systems, Inc. and GSX Polymers, Inc. ("GSX") filed a motion for summary judgment. On August 12, 2002, Magistrate Judge Foschio filed a Report and Recommendation, recommending that plaintiff's motion for partial summary judgment be granted in part and denied in part and that defendants' motion for summary judgment be granted in part and denied in part. Specifically, the Magistrate Judge recommended that summary judgment should: (1) as to whether the record establishes that defendant GSX's predecessor, U.S. Rubber Reclaiming Co., Inc. ("U.S.Rubber"), deposited hazardous substances into the Pfohl Brothers Landfill such that defendants are subject to CERCLA generator liability, be granted as to plaintiff and denied as to defendants; (2) as to plaintiff's CERCLA contribution claim based on successor liability of defendants, be granted in favor of plaintiff; (3) as to the imposition of a constructive trust upon defendants as requested by plaintiff in connection with the CERCLA contribution claim, be granted in favor of plaintiff; (4) as to plaintiff's fraudulent conveyance claim, be granted as to defendants because the claim is time-barred or, alternatively, plaintiff's constructive fraud claim should be granted as to plaintiff although the existence of material issues of fact preclude summary judgment on plaintiff's actual fraud claim; and (5) as to plaintiff's claim for piercing the corporate veil, be denied as to plaintiff and granted as to defendants.

Defendants filed objections to the Report and Recommendation on September 19, 2002. Plaintiff filed a response to the objections on October 18, 2002. Defendants filed a reply thereto on October 29, 2002. Oral argument on the objections was held on March 19, 2003.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, summary judgment: (1) as to whether the record establishes that defendant GSX's predecessor, U.S. Rubber, deposited hazardous substances into the Pfohl Brothers Landfill such that defendants are subject to CERCLA generator liability is granted as to plaintiff and denied as to defendants; (2) as to plaintiff's CERCLA contribution claim based on successor liability of defendants is granted in favor of plaintiff; (3) as to the imposition of a constructive trust upon defendants as requested by plaintiff in connection with the CERCLA contribution claim is granted in favor of plaintiff; (4) as to plaintiff's fraudulent conveyance claim is granted as to defendants because the claim is time-barred; and (5) as to plaintiff's claim for piercing the corporate veil is denied as to plaintiff and granted as to defendants. The case is hereby referred back to Magistrate Judge Foschio for further proceedings.

IT IS SO ORDERED.

## REPORT and RECOMMENDATION
### *JURISDICTION*

FOSCHIO, United States Magistrate Judge.

This case was referred to the undersigned by Honorable Richard J. Arcara on February 9, 1996, for pretrial matters including report and recommendation on dispositive motions. The matter is presently

before the court on motions filed on May 15, 2001 by Plaintiff for partial summary judgment (Docket No. 187), and by Defendants Allied Waste Systems, Inc. and GSX Polymers, Inc. (collectively, "Defendants")[2] for summary judgment (Docket No. 191).

### BACKGROUND

Plaintiff Pfohl Brothers Landfill Site Steering Committee commenced this contribution action on November 7, 1995, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, as amended,[3] seeking to recover from defendants Allied Waste Systems, Inc. and GSX Polymers, Inc. a portion of the costs Plaintiff voluntarily incurred in connection with the removal of various hazardous substances from a landfill located in the town of Cheektowaga, New York. Five amended complaints have been filed, and claims were first asserted against Defendants in the Fourth Amended Complaint, filed on June 11, 1999 (Docket No. 107) ("the Complaint" or "Complaint"), including a claim for contribution under CERCLA § 113(f)(1) (Count Four, ¶¶ 168–79), a claim for declaratory relief establishing the parties' rights and responsibilities with regard to the costs Plaintiff incurred in the investigation and remediation of hazardous substances at the Landfill based on corporate successor liability, constructive trust and *alter ego* (Count Five ¶¶ 180–83), and a claim for fraudulent conveyance in violation of the New York Uniform Fraudulent Conveyance Act, New York Debtor and Creditor Law ("N.Y. Debt. & Cred. Law") §§ 273 and 276 (McKinney 1990) (Count Seven, ¶¶ 184–87).

On May 15, 2001, Plaintiff filed a motion for partial summary judgment as to the Fourth, Fifth and Seventh Causes of Action set forth in the Fourth Amended Complaint. In support of the motion, Plaintiff filed a memorandum of law (Docket No. 188) ("Plaintiff's Memorandum"), a statement of facts pursuant to Fed. R.Civ.P. 56 (Docket No. 189) ("Plaintiffs' Rule 56 Statement of Facts"), and six volumes of exhibits. Also filed on May 15, 2001 was Defendants' motion for summary judgment seeking to dismiss all causes of action as against them. Defendants' motion was accompanied by a memorandum of law (Docket No. 192) ("Defendants' Memorandum"), the Affidavit of Nelson Perel, Esq. (Docket No. 193) ("Perel Affidavit"), a statement of facts pursuant to Fed.R.Civ.P. 56 (Docket No. 194) ("Defendants' Rule 56 Statement of Facts") and four volumes of exhibits.

On June 29, 2001, Defendants filed in opposition to Plaintiff's request for partial summary judgment an affidavit by Nelson Perel, Esq. (Docket No. 202) ("Perel Affidavit in Opposition to Partial Summary Judgment"), a memorandum of law (Docket No. 203) ("Defendants' Response Memorandum"), a response in opposition to Plaintiff's Rule 56 Statement of Facts (Docket No. 204), and two volumes of exhibits. In opposition to Defendants' motion for summary judgment Plaintiff, on June 29, 2001, filed a memorandum of law (Docket No. 207) ("Plaintiff's Response Memorandum"), a response in opposition to Defendants' Rule 56 Statement of Facts (Docket No. 208), and a Supplemental Appendix of exhibits.

---

**2.** The instant motions do not pertain to Defendant Browning Ferris Industries of New York, Inc. who remains a defendant to this action.

**3.** CERCLA was amended in 1986 by the Superfund Amendments and Reauthorization Act ("the SARA amendments"), to add a provision permitting contribution actions such as in the instant case. 42 U.S.C. § 9613(f).

Replies in further support of the summary judgment motions were filed on July 27, 2001. In particular, Plaintiff filed a reply memorandum of law (Docket No. 211) ("Plaintiff's Reply Memorandum"), the Declaration of Daniel M. Krainin (Docket No. 212) ("Krainin Declaration"), and another Supplemental Appendix of Exhibits. Defendants filed a reply memorandum of law (Docket No. 214) ("Defendants' Reply Memorandum"), an affidavit by Nelson Perel, Esq. (Docket No. 215) ("Perel Reply Affidavit"), and a volume of exhibits. By letter dated August 21, 2001, Attorney Perel advised the court that a case on which they relied in their previous motion papers in support of their argument that the Complaint fails to state a claim for a CERCLA contribution action had recently been affirmed. (Docket No. 236) ("August 21, 2001 Perel Letter"). Oral argument on the pending motions was deemed unnecessary.

Based on the following, the court finds that summary judgment should (1) as to whether the record establishes Defendant GSX Polymers, Inc.'s predecessor, U.S. Rubber, deposited hazardous substances into the Landfill such that Defendants are subject to CERCLA generator liability, be GRANTED as to Plaintiff and DENIED as to Defendants; (2) as to Plaintiff's CERCLA contribution claim based on successor liability of Defendants, be GRANTED in favor of Plaintiff; (3) as to the imposition of a constructive trust upon Defendants as requested by Plaintiff in connection with the CERCLA contribution claim, be GRANTED in favor of Plaintiff; (4) as to Plaintiff's fraudulent conveyance claim, be GRANTED as to Defendants because the claim is time-barred or, alternatively, Plaintiff's constructive fraud claim should be GRANTED as to Plaintiff but DENIED as to the actual fraud claim as the existence of material issues of fact preclude summary judgment on Plaintiff's actual fraud claim; and (5) as to Plaintiff's claim for piercing the corporate veil, be DENIED as to Plaintiff and GRANTED as to Defendants.

### FACTS[4]

Plaintiff Pfohl Brothers Landfill Site Steering Committee ("the Steering Committee" or "Plaintiff"), is comprised of various corporations that have voluntarily participated in the remediation measures at the Pfohl Brothers Landfill ("the Landfill"), which comprises 120 acres in the Town of Cheektowaga, New York. Beginning in the 1930s and continuing until approximately 1969, the Landfill began accepting waste materials from numerous companies. According to Plaintiff, in 1982, the New York State Department of Environmental Conservation ("the DEC") issued a Record of Decision delineating interim remedial measures ("IRM") required to remove certain waste, an offsite remedial investigation and a permanent remedy for the Landfill. In response to the DEC's IRM, the Steering Committee has implemented the remediation measures, as directed by the DEC's IRM, at the Landfill and, in doing so, have incurred response costs in excess of $30 million. In this action, the Steering Committee seeks contribution from other companies, including Defendants, which did not participate in the remediation, and which allegedly are also responsible for the presence of hazardous substances in the Landfill.

Among the companies the Steering Committee alleges deposited waste containing hazardous substances into the Landfill is U.S. Rubber Reclaiming Co., Inc. ("U.S.Rubber"), a publicly held corporation which was engaged in the business of processing rubber waste products, including passenger vehicle tires, to produce

---

**4.** Taken from the pleadings and motion papers filed in this action.

"reclaimed" rubber that was then sold as a commercial product. U.S. Rubber maintained and operated a rubber reclamation plant in Buffalo, New York ("the Buffalo plant") during the 1930s and 1940s when it opened a second rubber reclamation plant located in Cheektowaga, New York ("the Cheektowaga plant") approximately three miles from the Landfill, and the Buffalo plant was closed. Over a period of years, U.S. Rubber's Cheektowaga operations were moved to its manufacturing plant in Vicksburg, Mississippi and the Cheektowaga plant was closed in 1966. The parties do not dispute that between 1948 and 1966, U.S. Rubber disposed of waste materials from its Cheektowaga plant, including baled wastes, liquid wastes and general plant waste, into the Landfill. Whether such wastes contained substances considered hazardous under CERCLA regulations, however, is contested by Defendant GSX Polymers, Inc.

Following a 1979 merger with Genstar Merger Corp., a wholly owned subsidiary of Genstar, Ltd. ("Genstar"), Genstar became the sole shareholder of U.S. Rubber. In 1985, Genstar created GSX, Inc. ("GSX") as a wholly owned subsidiary under which certain acquired and existing corporations, including U.S. Rubber, were organized as GSX divisions. By 1986, GSX consisted of three separate waste business operational groups: solid waste, hazardous waste and waste technology. U.S. Rubber, a GSX subsidiary in the waste technology group, changed its name to GSX Polymers, Inc. ("GSX Polymers"), and operated three manufacturing plants located in Mississippi, Arizona and Illinois. While owned by Genstar and GSX, U.S. Rubber and GSX Polymers, Inc. Vice President and President Bobby D. LaGrone was responsible for U.S. Rubber's daily operations. The market for reclaimed rubber collapsed in the 1980s when innovations in the tire manufacturing process contributed to a decreased demand for reclaimed rubber products, and Mr. LaGrone was instructed to sell GSX Polymers. Laidlaw, Inc. ("Laidlaw") purchased the stock of GSX Polymers in 1986 from Genstar.

By letter to U.S. Rubber dated April 29, 1986, the DEC advised that the Landfill had been identified as an inactive hazardous waste disposal site under New York law and U.S. Rubber had been identified as a generator of wastes disposed of at the Landfill. The DEC sent a further letter dated August 15, 1986 to GSX Polymers as U.S. Rubber's successor in interest. Both letters requested information for use in determining whether U.S. Rubber and GSX Polymers should be considered potentially responsible parties ("PRPs") with regard to the Landfill's remediation. GSX Polymers responded with the requested information by letter to the DEC dated January 30, 1987.

Meanwhile, Defendants maintain that prior to acquiring the stock of GSX, Laidlaw intended to expand its presence in the solid waste industry by integrating GSX's solid waste companies into Laidlaw's existing operations and selling the remaining GSX operations, including GSX Polymers, the hazardous waste and waste technology operations. Defendants further maintain that because Laidlaw intended to sell GSX Polymers before acquiring it, there was no effort to integrate GSX Polymer's daily operations with those of Laidlaw, GSX Polymers was never added to Laidlaw's main accounting system and Mr. LaGrone never became an employee of Laidlaw, but remained employed by GSX Polymers which he continued to operate as he had prior to Laidlaw's acquisition. Rather, GSX Polymers, as well as the other GSX subsidiaries acquired by Laidlaw, had the same board of directors and officers as prior to the Laidlaw stock acquisition, although each subsidiary maintained sepa-

rate minute books, financial books and records. GSX Polymers also had its own employees, headquarters, business address, office space and telephone number.

By letter to Laidlaw dated February 11, 1987, the DEC advised it was aware Laidlaw was the new owner of U.S. Rubber.[5] The DEC also requested information pertaining to solvent waste and a fine rubber and oil mixing operation at U.S. Rubber's Cheektowaga plant, as well as a diagram of the Cheektowaga plant's waste flow. In Laidlaw's response letter dated March 30, 1987, Laidlaw informed the DEC that it was difficult to provide answers to the DEC's requests as there had been no Buffalo operations for twenty years, few records remained and no present employee had ever worked in the Buffalo operations. Laidlaw further advised that the information it did provide was based on its present operations in the Vicksburg, Mississippi plant and that it "assume[d] that the experience of the Buffalo operations would have been similar in nature." Pl's Exhibit 35.[6]

GSX Polymers' assets were sold by Laidlaw in 1987. Specifically, by agreements dated May 14, 1987 and June 2, 1987 the Arizona and Illinois plants were sold for $ 675,000 to Tonson, Inc. ("Tonson"), and, by agreement dated September 1, 1987, the Vicksburg, Mississippi plant was sold for $1,443,340 to U.S. Rubber Reclaiming, Inc. ("U.S. Rubber Indiana"),[7] a wholly-owned subsidiary of The Curtis Publishing Company ("Curtis"). GSX

Polymers discontinued active operations as of October 1987, all of its assets having been sold and no employees were retained or hired. GSX Polymers' remaining financial transactions and legal matters were handled by Laidlaw employees Susan Whittaker ("Whittaker"), a CPA, and attorney Thomas Fowler ("Fowler").

In a Memorandum dated November 13, 1989, Whittaker directed Laidlaw employees Carol Sandwell ("Sandwell") and in-house counsel Dick van Wyck ("van Wyck") to issue a dividend from GSX Polymers to Laidlaw in the amount of $2,588,649.56. Defs' Ex. 42.[8] In another Memorandum dated April 9, 1990, Whittaker directed Sandwell and van Wyck to declare a second dividend in the amount of $ 207,853 representing a pension refund. Defs' Ex. 44. The $2.8 million distributed as dividends to Laidlaw represented the total amount remaining on GSX Polymers' books, including the proceeds from the sale of GSX Polymers' assets and the pension plan termination. Plaintiff's Memorandum at 32–33; Defendants' Memorandum at 16–17. Rather than merging GSX Polymers into Laidlaw, Whittaker, upon the advice of van Wyck, undertook the process to liquidate and dissolve GSX Polymers as a business entity, allegedly to terminate GSX Polymers' tax obligations. Plaintiff's Memorandum at 33–37; Defendants' Memorandum at 17–19.

In November 1991, the DEC issued its Proposed Remedial Action Plan ("the PRAP") for the Landfill. Pl's Ex. 58.[9]

---

5. Apparently, the DEC was initially unaware that U.S. Rubber had been renamed GSX Polymers, Inc.

6. References to "Pl's Ex." are to the exhibits contained in six volumes Plaintiff submitted on May 15, 2001, in support of summary judgment.

7. Nothing in the record suggests that U.S. Rubber Reclamation Co., Inc. and U.S. Rubber Reclaiming Inc. are the same entity.

8. References to "Defs' Ex." are to the exhibits contained in seven volumes Defendant submitted on May 15, 2001 in support of summary judgment.

9. The only date on the PRAP is "November 1991."

Laidlaw officers Richard Norris and van Wyck executed a Certificate of Dissolution ("the Certificate of Dissolution") dated November 7, 1991 to dissolve GSX Polymers. Pl's Ex. 60. The Certificate of Dissolution was sent to CT Corporation for filing with New York State. On May 4, 1992, Laidlaw received from the DEC a Remedial Design/Remedial Action notice letter ("the RD/RA notice"), advising that Laidlaw was, pursuant to New York Environmental Conservation Law § 27–1313 and CERCLA § 107(a), a "PRP" with regard to the Landfill.[10] Pl's Ex. 59. Laidlaw engineer Doug Borro represented Laidlaw at a May 5, 1992 meeting between the DEC and the PRPs, including Laidlaw as owner of GSX Polymers, who had received the RD/RA notice regarding potential liability for the Landfill. On May 6, 1992, Laidlaw moved to expedite completion of GSX Polymers' dissolution. Meanwhile, by letter dated May 6, 1992, DEC attorney Cheryl Peterson informed Laidlaw that if negotiations regarding an On-site RD/RA Consent Order between the PRP members of the Steering Committee and the DEC were not successful, the DEC would pursue legal action, including pursuant to CERCLA § 107, against those identified as PRPs. By letter to Laidlaw and other PRPs dated May 21, 1992, a Mr. Joseph Heimbuch of Technical Environmental Consultants, on behalf of the PRPs and many Steering Committee Members, described what tran-

spired at the May 5, 1992 meeting with the DEC officials, explaining that New York State would likely litigate the matter if the parties declined to negotiate with the DEC, and that all PRPs would likely be named as defendants in such a law suit.

New York's tax authority filed its consent to the dissolution of GSX Polymers on June 29, 1992 and, on July 8, 1992, the New York Secretary of State filed GSX Polymers' Certificate of Dissolution. Laidlaw never informed New York's Secretary of State that it had been noticed as a PRP with regard to the Landfill, nor did Laidlaw, despite continuing to participate in negotiations relating to liability for the Landfill, ever inform the Steering Committee members or the DEC that GSX Polymers' remaining cash assets had been liquidated and distributed, that paperwork to dissolve GSX Polymers had been prepared and filed, or that Laidlaw intended to interpose such actions as a defense to liability. On December 30, 1996, Defendant Allied Waste Systems, Inc. ("Allied"), purchased Laidlaw.

On April 9, 2001, the members of the Steering Committee and the DEC reached a settlement on cost recovery with regard to the Landfill and an administrative Order on Consent was entered to that extent.[11] To date, the Steering Committee has paid out $ 32 million to remediate the Landfill as required by the DEC's Order on Consent.

---

10. "Potentially responsible parties" are persons who are liable for response costs, i.e., "necessary cleanup costs incurred by any other person consistent with the national contingency plan," as provided in CERCLA § 107(a)(4)(A), (B). *See Bedford Affiliates v. Sills*, 156 F.3d 416, 423 (2d Cir.1998) ("[p]otentially responsible persons" may be held liable for "necessary cleanup costs 'incurred by any other person consistent with the national contingency plan.' CERCLA § 107(a)(4)(B)."); *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 513 (2d Cir.1996) ("potentially responsible parties" are liable for cleanup

costs under CERCLA § 107(a)), *cert. denied*, 524 U.S. 926, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998). Such potentially responsible parties are commonly known as "PRPs." *Aviall Services, Inc. v. Cooper Industries, Inc.*, 263 F.3d 134, 135 (5th Cir.), *en banc rehearing granted*, 278 F.3d 416 (5th Cir.2001).

11. The Order on Consent states that it is entered into pursuant to the DEC's authority to seek response costs in a civil action under 42 U.S.C. § 9607 and is legally binding as to PRPs. N.Y. Envtl. Conserv. Law § 27.1313(a) and (b)(10).

## DISCUSSION

### 1. Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999) (citing *Anderson, supra*, at 255, 106 S.Ct. 2505). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex, supra*, at 322, 106 S.Ct. 2548; *see Anderson, supra*, at 247–48, 106 S.Ct. 2505 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. supra*, at 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir.1998).

Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995). In opposing a motion for summary judgment a party "may not simply rely on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga, supra*, at 18 (citing cases). Summary judgment may be granted where the evidence proffered in support is sufficient to sustain a directed verdict in the movant's favor. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997) ("Summary judgment is designed to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict.").

In this case, Plaintiff has moved for partial summary judgment on its Fourth, Fifth and Seventh Causes of Action asserted against Defendant in the Fourth Amended Complaint.[12] Defendants have

---

12. Plaintiff's Fifth Amended Complaint, filed on April 4, 2000, adds William Pfohl as a Defendant, asserts additional factual allega- tions irrelevant to the instant motions and amends the previously asserted Second, Fifth

moved for summary judgment on all causes of action asserted against them.

### 2. *Plaintiff's § 113(f) Contribution Claim*

■ CERCLA § 107(a) imposes liability upon four classes of "persons," including: present owners and operators of facilities that accepted hazardous substances; (2) past owners and operators of such facilities; (3) generators of hazardous substances; and (4) certain transporters of hazardous substances.[13] 42 U.S.C. § 9607(a); *Betkoski, supra,* at 514 (CERCLA's "broad reach extends liability to all those contributing— from generation through disposal to—the problems caused by hazardous substances.") (quoting *B.F. Goodrich v. Murtha,* 958 F.2d, 1192, 1198 (2d Cir.1992)). These so-called PRPs are held strictly liable for "a broad range of remediation expenses, including all costs of removal of the substances not inconsistent with the national contingency plan, other necessary response costs, damages for injury to natural resources, and the cost of health assessments." *Betkoski, supra* (citing 42 U.S.C. § 9607(a)(4)). *See also Bedford Affiliates, supra,* at 423. Such liability is joint and several unless the PRP can prove the harm is divisible. *Betkoski, supra,* at 513.

■ As a broad remedial statute, CERCLA should be given a liberal construction in order to effect its purposes of "assuring that those responsible for environmental damage and injury from hazardous substances "bear the costs of their actions." " *Betkoski, supra,* at 513 (citing S. Rep. 848, 96th Cong., 2d Sess. 13 (1980) (Senate Report), *reprinted in* 1 Senate

Comm. on Env't and Pub. Works, Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund), at 305, 320 (1983) (Leg.Hist.)). Such purpose includes prompt and efficient cleanups and settlements to avoid unnecessary expense to the public of lengthy litigation. *Id.* In the instant case, it is undisputed that U.S. Rubber (later, as noted, renamed "GSX Polymers") qualifies as a person subject to CERCLA liability provided the waste it generated in its rubber reclaiming process at its Cheektowaga facility and which was subsequently deposited into the Landfill contained hazardous substances as defined under CERCLA.

■ As originally enacted, CERCLA did not expressly authorize a defendant PRP to bring a contribution action to recover from other PRPs, although many judicial decisions recognized an implied cause of action for contribution under § 107(a). *Key Tronic Corporation v. United States,* 511 U.S. 809, 816, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994) (citing cases); *Bedford Affiliates, supra,* at 423. However, only "innocent persons," *i.e.,* persons who are not PRPs, often the federal or a state government, may recover environmental response costs from a PRP under § 107(a). *Bedford Affiliates, supra,* at 423–24. Accordingly, § 113(f), enacted as part of the 1986 amendments to CERCLA, expressly created a cause of action for contribution against another PRP to be brought by a PRP who is subject to liability under § 107(a). *See* 42 U.S.C. § 113(f). *See Bedford Affiliates, supra,* at 423–25. To date, a contribution action pursuant to § 113(f) remains a PRP's only federal rem-

---

and Eighth Causes of Action only to assert them also against newly added Defendant William Pfohl.

**13.** None of the several statutory affirmative defenses created to mitigate the harshness of

strict liability for innocent parties who would otherwise be liable under § 9607(a), *see* 42 U.S.C. § 9607(b)(1)-(4), are relevant to the instant case.

edy for recovery of any of its incurred response costs under CERCLA. *See Bedford Affiliates, supra,* at 424. Such actions are governed by federal, not state, law. 42 U.S.C. § 9613(f)(1).

In the instant case, the Steering Committee asserts 42 U.S.C. § 9613(f)(1) in seeking contribution from Defendants. Complaint, ¶¶ 2, 113, 115, 123, 125; Fourth Amended Complaint, ¶¶ 171, 179, 183. As relevant, 42 U.S.C. § 9613(f)(1) provides that

> [a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, *during or following any civil action under section 9606 of this title or under section 9607(a) of this title* ....
>
> \* \* \* \* \* \*
>
> *Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.*

42 U.S.C. § 9613(f)(1) ("§ 113(f)(1)") (emphasis added).

■ Defendants argue that the phrase "during or following any civil action under section 9606 of under section 9607(a) of this title" requires that a claim for contribution is authorized by § 113(f)(1) only if an action pursuant to CERCLA § 106 ("§ 106") or § 107(a) ("§ 107" or "§ 107(a)") has been commenced against the PRP from whom contribution is sought. Defendants' Memorandum at 56–57.[14] As it is not disputed that the instant case does not derive from a pending or completed civil action pursuant to § 106 or § 107(a), Defendants accordingly maintain that the Complaint fails to state a claim and must be dismissed. *Id.* at 57–58.

The Steering Committee, in contrast, maintains that the last sentence of § 113(f)(1) is intended as a 'savings clause' to establish the right to a contribution action even in the absence of a previously commenced § 106 or § 107(a) action. Plaintiff's Response Memorandum at 38. Alternatively, Plaintiff maintains that even if it has failed to allege a claim for relief specifically under § 113(f)(1), the Complaint states a claim for relief under § 113(f)(3)(B). *Id.* at 38–39. In support, the Steering Committee relies on the principle that federal "notice" pleading rules require the liberal construction of a complaint so as to allow valid causes of action where supported by the facts to be decided on the merits, especially where a broad interpretation will not prejudice a defendant. *Id.* at 38–39. Specifically, the Steering Committee maintains that the allegation in the Fourth Amended Complaint asserting a cause of action against Defendants based on "Plaintiff's right to contribution under § 113(f)" should be liberally construed as including a claim under § 113(f)(3)(B). *Id.* at 39–40.

CERCLA § 113(f)(3)(B) provides that "[a] person who has resolved its liability to the United States or to a State for some or all of a response action of for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party [sic] to a settlement referred to in paragraph (2)." 42 U.S.C. § 9613(f)(3)(B). Paragraph (2) of § 113(f) refers to any person who has "resolved its liability to the United States or to a State in an *administrative* or *judicially approved settlement,*" (emphasis added) as to matters covered by such settlement and

---

**14.** CERCLA § 106 provides for an abatement action to be brought by the federal government to avert an imminent, substantial and dangerous actual or threatened release of a hazardous substance; CERCLA § 107 permits recovery for response costs, *i.e.,* removal and remediation of released hazardous substances incurred by any person consistent with CERCLA's national contingency plan.

grants such person protection from future contribution claims by other PRPs who are not parties to the settlement and reduces the amount of response costs recoverable from such non-settling PRPs, unless discharged from liability by the settlement, in further CERCLA claims. 42 U.S.C. § 9613(f)(2).

Alternatively, the Steering Committee requests permission to file a further amended complaint specifically alleging a cause of action against Defendants pursuant to § 113(f)(3)(B). Plaintiff's Response Memorandum at 39–40. Defendants reply that earlier allegations in the Complaint, as amended, demonstrate that the claim is brought pursuant to § 113(f)(1), and that the Steering Committee should not be permitted to file another amended complaint asserting a claim under § 113(f)(3)(B) as such an assertion would require reopening discovery. Defendants' Reply Memorandum at 28–29. However, Defendants have not articulated any specific reasons why such additional pleadings may be required simply because a different provision within § 113 may be relied upon to sustain the Complaint. Defendants' challenge to Plaintiff's contribution cause of action fails for several reasons.

First, in *Bedford Affiliates, supra,* the Second Circuit upheld an action for contribution pursuant to § 113(f)(1) brought by a PRP against other PRPs in the absence of any prior action for response costs pursuant to either § 106 or § 107(a). In *Bedford Affiliates,* the plaintiff held title to the site at issue since 1952 and, as such, was subject to CERCLA liability under § 107(a)(2) as owner of the site on Long Island, New York, during the period of disposal of hazardous substances. *Bedford Affiliates, supra,* at 416. During that time, the site had been subleased to dry cleaning businesses which caused contamination through repeated releases of tetracholoroethylene, a dry cleaning solvent

constituting a hazardous substance for CERCLA purposes. *Id.* Eventually, the DEC was informed of the releases and because the level of tetracholoroethylene at the site was 170 times greater than the DEC's standard, the site was declared to be a significant threat to health and the environment. *Id.* at 420. Plaintiff, Bedford Affiliates, owner of the site throughout the period at issue, then entered into a consent order with the DEC permitting immediate remediation steps in contemplation of a final consent order with the DEC. *Id.* at 420–21.

Bedford Affiliates sued its lessee and a sublessee, Sills, as a PRP primarily responsible for the contaminating releases for response costs pursuant to § 107(a) and, in the same action, asserted a claim against the lessee and sublessee for contribution pursuant to § 113(f)(1). *Bedford Affiliates, supra,* at 421. The district court rejected the plaintiff's § 107(a) claim as one not available to a PRP under CERCLA but found for the plaintiff on its contribution claim apportioning 95% of the plaintiff's liability for past and future response costs against the tenant/sublessor (5%) and the subtenant polluter, defendant Sills, (95%). *Id.*

Reasoning that as a PRP is, under CERCLA, a joint tortfeasor severally liable for § 107(a) response costs, the Second Circuit held that such PRP cannot seek indemnification for its response costs from other PRPs as being itself a non-innocent PRP it cannot recover 100% of its liability from its other PRPs and to permit a PRP to bring a § 107(a) action would render § 113(f)(1) a nullity. *Bedford Affiliates, supra,* at 423–24. However, the court held that under CERCLA § 113(f)(1), any PRP, including the plaintiff, could seek, in contribution, equitable apportionment of any response costs for which it became liable to pay which, under the facts the case

included the plaintiff's obligation to remediate the site pursuant to the interim consent order and the expectation it would be liable for future remeditation costs imposed pursuant to a final consent order with the DEC. *Id.* at 415.

■ According to the Second Circuit, a *prima facie* cause of action for relief pursuant to § 113(f)(1) requires allegations (and proof) that (1) the defendant is a responsible party as defined in § 107(2); (2) the site is a facility; (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff has incurred response costs; and (5) the plaintiff's response actions and costs conform to the national contingency plan. *Bedford Affiliates, supra,* at 427 (citing *Betkoski, supra,* at 514, and *Murtha, supra,* at 1198). No requirement for a precedent § 106 or § 107(a) action is stated by the court to be among the required elements for a contribution action pursuant to § 113(f)(1). *Id.* Thus, this court finds that commencement of a § 106 or § 107(a) action for response costs against a PRP seeking contribution from other PRPs pursuant to § 113(f)(1) is not a necessary prerequisite to such contribution claim and that the absence of such response cost recovery actions is not a bar to a § 113(f)(1) action. *See Coastline Terminals of Connecticut, Inc. v. USX Corporation,* 156 F.Supp.2d 203, 207 (D.Conn.2001) (sustaining § 113(f)(1) action by corporate purchaser of contaminated property which, as a PRP under § 107(a)(2), initiated cleanup of property in accordance with state law conditioning real property transfers upon purchaser's certification that it would investigate and remediate property known to be contaminated by hazardous waste against defendant's contention that plaintiff was not subject to prior § 106 or § 107(a) action and therefore was prevented from suing for contribution under CERCLA, citing *Bedford Affiliates, supra* ).

■ Second, Defendants' reliance on caselaw, *e.g., Aviall Services, Inc., supra,* (and citing authorities at 141–42), holding that § 113(f)(1) precludes an action for contribution under it unless preceded by a § 106 or § 107(a) response cost action, Defendants' Memorandum at 56–58; Defendants' Reply Memorandum at 28–29; August 21, 2001 Perel Letter, is misplaced. This court is not bound to follow such non-circuit caselaw. *In re Ramaekers,* 33 F.Supp.2d 312, 315 (S.D.N.Y.1999) (citing *In re Korean Air Lines Disaster,* 829 F.2d 1171, 1175 (D.C.Cir.1987) (" 'There is no room in the federal system of review for rote acceptance of the decision of a court outside the chain of direct review. If a federal court simply accepts the interpretation of another circuit without independently addressing the merits, it is not doing its job.' ") (quoting R.L. Marcus, Conflict Among Circuits and Transfers Within the Federal Judicial System, 93 Yale L.J. 677, 702 (1984))). The court, moreover, finds the reasoning of such cases unpersuasive. Specifically, in *Aviall,* the majority found as a matter of statutory construction that the word "may" in the first sentence of § 113(f)(1) should be read to mean that a plaintiff in a § 113(f)(1) action must "be or have been, a defendant in a § 106 or § 107(a) action," *Aviall, supra,* at 140, because (1) canons of statutory construction require the legislated word "may" receive a mandatory or exclusive sense as in "must" or "shall," *Aviall, supra,* at 138; (2) reading the last sentence of § 113(f)(1) to permit a contribution action absent a prior § 106 or § 107 action would render the first sentence of § 113(f)(1) surplusage, *Aviall, supra,* at 140; and (3) the last sentence of § 113(f)(1), which states that the absence of a § 106 or § 107(a) action "shall not diminish the right of any person to bring an action for contribution," is a congressional statement that § 113(f) does not

preempt contribution actions based on state law. *Id.*

The difficulty with the *Aviall* majority's interpretation of the word "may" in § 113(f)(1)'s first sentence is that it fails to recognize the explicit authorization for contribution actions in cases provided for elsewhere in § 113(f) in which no § 106 or § 107(a) action will necessarily have been brought. Specifically, CERCLA § 113(f)(3)(B) authorizes a PRP who has administratively settled its liability under CERCLA § 106 or § 107(a) to the federal or a state government regarding its response and remediation costs to seek contribution against other non-settling PRPs without regard to a previously commenced § 106 or § 107 action. 42 U.S.C. § 9613(f)(3)(B). As § 113(f)(3)(B) also permits a § 113(f) contribution claim in the case of a "judicially" settled response cost claim, such reference reasonably attaches to litigation; however, an administrative settlement by definition does not refer to formal judicial proceedings. Additionally, neither CERCLA § 122(a), 42 U.S.C. § 9622(a) ("The President "may enter into an agreement with any person ... to perform any response action" "), nor § 122(h), 42 U.S.C. § 9622(h) (the head of any agency "may ... settle a claim under section [107]"), which authorizes the President and federal agencies, *e.g.*, the Environmental Protection Agency, to enter into settlements with PRPs for response costs, require that such settlements be only in

regard to a pending or completed § 106 or § 107(a) action.[15]

Further, as CERCLA explicitly provides that state law, including common law, is not affected by CERCLA with regard to the obligations or liabilities of persons "with respect to releases of hazardous substances," 42 U.S.C. § 9652(d), there is no basis to conclude that the last sentence of § 113(f)(1) is, as the majority in *Aviall* found, a statement that state contribution remedies not be preempted. To do so would render § 9652(d) itself surplusage to that extent. However, the Second Circuit has explicitly held that § 113(f) in its entirety preempts state law contribution remedies. *Bedford Affiliates, supra,* at 425–26. In *Bedford Affiliates,* the Second Circuit held that CERCLA's contribution provision, 42 U.S.C. § 9613, preempts New York's state common law remedies for restitution and indemnification. *Bedford Affiliates, supra,* at 426–27. Specifically, the court held that permitting common law restitution and indemnification actions to proceed in state court would bypass CERCLA's "carefully crafted settlement system" and create an actual conflict between CERCLA and state common law causes of action in the nature of contribution claims which could be brought pursuant to § 113(f). *Id.* at 427. The context in which in which the court's discussion occurs, however, establishes that CERCLA's contribution provision preempts a cause of action under New York common law for contribution, rather than for restitution.[16]

---

**15.** The Aviall majority's view that the last sentence of § 113(f)(1) somehow could be rendered surplusage depends on the validity of the court's construction of the meaning of the first sentence.

**16.** The term "restitution" is broadly defined under New York law to include both remedies of contribution and indemnification. *See* 23 N.Y. Jur.2d Contribution, Indemnity and Subrogation §§ 1–2, 4. Contribution is distinguishable from indemnity insofar as contribution seeks only ratable or proportional reim-

bursement, while indemnification shifts the entire liability for full, rather than partial, reimbursement to the party at fault. *Id., § 4; Glaser v. M. Fortunoff of Westbury Corp.,* 71 N.Y.2d 643, 529 N.Y.S.2d 59, 524 N.E.2d 413, 415 (1988). Additionally, in the case of fault or intentional acts, a plaintiff's remedy in tort seeks damages in the nature of indemnification for an actionable loss. *Glaser, supra,* at 415.

A potentially responsible party cannot bring a CERCLA cost recovery under 42 U.S.C. § 9607 but, rather, is limited to an action for

*Id.* Thus, the *Aviall* court's view that the last sentence of § 113(f)(1) is a statement of non-preemption is at odds with the express holding in *Bedford Affiliates* that § 113(f) preempts contribution claims for CERCLA response costs under state law and other provisions of CERCLA itself.

Furthermore, the *Aviall* majority's restrictive reading of § 113(f) fails to recognize that there is no prohibition in § 113 against a PRP plaintiff's establishment of its, as well as a defendant's, liability for § 106 or § 107(a) as an element of its contribution action nor does § 113(f)(1) mandate that the amount of the plaintiff's response cost liability sought to be equitably apportioned be exclusively determined *in* a precedent § 106 or § 107(a) action. Indeed, even if a § 107(a) action were filed and then terminated in connection with the settlement procedures contemplated by § 113(f)(2), the amount sought in contribution is established by the settlement, rather than by a judicial determination on the merits of the § 107(a) action.[17] *Aviall*'s holding interpretation that § 113(f)(1) necessitates a predicate § 107(a) action would thus require commencing a § 107(a) action despite the fact that response cost liability and the cost of remediation had been resolved by the parties to a settlement as expressly provided for in § 113(f)(2) and (f)(3)(B). It is unlikely Congress intended to mandate such an unnecessary and counterproductive formality. Therefore, the court reads the word "may" in § 113(f)(1) in its ordinary permissive, not mandatory, sense and, in the absence of controlling authority to the contrary, rejects the *Aviall* court's unduly narrow interpretation.[18] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1396 (defining "may" as having permission or the liberty to do something).

Finally, to apply the construction adopted in *Aviall* would engender costly and time consuming litigation, contrary to Congress' purpose in enacting § 113 to promote "efficient responses to environmental harm" and "to encourage settlements that reduce the inefficient expenditure of public funds on lengthy litigation." *Betkoski, supra,* at 513. For these reasons, the court declines to follow *Aviall* and other similar cases.[19] *See Coastline*

---

contribution under 42 U.S.C. § 9613(f), and no underlying § 9607 action was filed against the plaintiff in *Bedford Affiliates. Bedford Affiliates, supra,* at 424. Accordingly, the *Aviall* court's determination that the cause of action for contribution available under 42 U.S.C. § 9613(f) preempted the plaintiff's state law restitution claim establishes that the plaintiff's asserted state common law action for restitution actually sought contribution. Further, to the extent the plaintiff's restitution claim in *Bedford Affiliates* could be considered as an attempt to obtain indemnification from the defendant, it was also foreclosed by the court's determination that such relief was not available to a non-innocent PRP in a CERCLA § 107 action. *Bedford Affiliates, supra,* at 424.

17. The majority opinion in *Aviall* relies on legislative history to bolster its conclusion. *See Aviall, supra,* at 140. However, the reference to the quotation relied upon by the majority opinion that "parties found liable under sections 106 or 107 have a right of contribution" *Aviall, supra,* at 140, does not say that such a finding results from an action brought pursuant to § 106 or § 107; rather, it states exactly what the Second Circuit held in *Bedford Affiliates, i.e.,* that one element of a § 113(f) action is that the liability created under § 107(a), for which contribution is sought, be alleged and proven in the § 113(f) action. *Bedford Affiliates, supra,* at 416.

18. At least one court has gone so far as to hold that a contribution action may be brought pursuant to § 113(f)(1) in the absence of either a § 106 or § 107(a) action, even though there had been no administrative or judicially approved settlement. *See Coastline Terminals of Connecticut, Inc, supra,* at 208.

19. In matters of statutory construction, "the meaning of a sentence may be more than that of the separate words, as a melody is more

*Terminals, supra,* (sustaining § 113(f)(1) actions in absence of either § 107(a) action or state administrative consent order).

The court's examination of the exhibits submitted in connection with the summary judgment motions demonstrates that in this case a cause of action exists under § 113(f)(1), 42 U.S.C. § 9613(f)(1), based on *Bedford Affiliates, supra,* and, alternatively, under § 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B), based on the April 9, 2001 Order on Consent between the Steering Committee and DEC establishing the Steering Committee's liability for response costs at the Landfill, in accordance with 42 U.S.C. § 9607(a), and pursuant to which the Steering Committee members agreed to remediate the Landfill at their expense. The Steering Committee has submitted copies of two Orders on Consent entered into by the Steering Committee members and the DEC, including a preliminary one dated October 4, 1993 (Pl's Ex. 93) ("1993 Order on Consent"), and the final one dated April 9, 2001 (Pl's Exhibit 92) ("2001 Order on Consent").[20] Both Orders on Consent state that they are entered into pursuant to the DEC's authority under New York Environmental Conservation Law § 27–1301 *et seq.,* and 42 U.S.C. § 9607, and that the Orders on Consent qualify as State administrative settlements within the meaning of 42 U.S.C. § 9613(f). 1993 Order on Consent, ¶ 1; 2001 Order on Consent, ¶ 1.

The 1993 Order on Consent provides for the Steering Committee members to reimburse the DEC for the $1.8 million already incurred in carrying out any interim remedial measures designed to cleanup the Landfill, as well as additional costs the DEC was expected to incur in connection with the cleanup. 1993 Order on Consent, ¶¶ 6–8 and § VII. Similarly, the 2001 Order on Consent provides for the Steering Committee members to reimburse the DEC $ 4.8 million plus 50% of any additional costs recovered by the Steering Committee in the instant case, not to exceed $ 1.5 million. 2001 Order on Consent, ¶¶ 6–8 and § VIII. The Orders on Consent thus establish that they are administrative settlements by which the Steering Committee members have settled their liability to New York in connection with the cleanup and remediation of the Landfill, in ac-

---

than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create." *Helvering v. Gregory,* 69 F.2d 809, 810–11 (2d Cir.1934) (L.Hand, J.), *aff'd,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). *See also FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 189, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (Breyer, J., dissenting); *Garlock, Inc. v. Commissioner,* 489 F.2d 197, 200 (2d Cir.1973) (Oakes, J.).

20. Although not stated with greater specificity, the Complaint does allege that by entering into the 1993 Order on Consent, the Steering Committee members agreed to perform the interim remedial measures the DEC called for "and to reimburse the DEC for some of its costs in responding to a release, or threat of release of hazardous substances at the Site [Landfill]." Complaint, ¶ 31. The court's consideration of the argument as to whether the Complaint states a claim for a contribution action ordinarily would be restricted to consideration of the four corners of the Complaint. However, where, as here, the validity of the claim "relies heavily" on a written instrument such that the document is "integral to the complaint," the court may consider it regardless of whether the document is attached as an exhibit to, or incorporated by reference into, the complaint. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002). Moreover, as the instant motions before the court are for summary judgment pursuant to Fed.R.Civ.P. 56, rather than to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court is permitted to consider the exhibits submitted as there is no danger that Defendants will be harmed by the court's consideration of materials extraneous to the Complaint of which Defendants had no notice. *Id.* at 153.

cordance with 42 U.S.C. § 9613(f)(3)(B). The Orders on Consent also demonstrate that the Steering Committee members as PRPs faced liability to New York under 42 U.S.C. § 9607(a) and therefore the Complaint, as amended, states a claim for contribution under 42 U.S.C. §§ 9613(f)(1) and 9613(f)(3)(B). Thus, as in *Bedford Affiliates*, because Plaintiff here has sued for contribution after having entered into an administrative settlement with the DEC, it has a cause of action against Defendants pursuant to § 113(f)(1), as well as under § 113(f)(3)(B). Either way, a prior § 107(a) action is not requisite to Plaintiff's claim.

Accordingly, as it is undisputed that the Steering Committee is a party which has resolved its liability as a § 107(a) PRP to the state, it is permitted under § 113(f)(1) and § 113(f)(3)(B) to bring an action for contribution against Defendants.

### 3. *Generator Liability*

█ The parties dispute whether U.S. Rubber generated any of the substances considered hazardous under CERCLA regulation 40 C.F.R. § 302.1 et seq. A determination that U.S. Rubber did not generate any such substances would negate any generator liability against U.S. Rubber's corporate successor in interest.

█ It is not necessary that a specific mixture or waste solution be included on CERCLA's list of hazardous substances, *i.e.*, 42 U.S.C. § 9601(14), to fall within CERCLA's coverage. *Betkoski, supra*, at 515. Rather, " '[w]hen a mixture or waste solution contains hazardous substances, that mixture is itself hazardous for purposes of determining CERCLA liability. Liability under CERCLA depends only on the presence *in any form* of listed hazardous substances.' " *Id.* (quoting *B.F.*

*Goodrich Co. v. Murtha*, 958 F.2d 1192, 1201 (2d Cir.1992)) (emphasis added). Nor does it matter that the waste contained only a minuscule amount of a hazardous substance as Congress, in enacting CERCLA, did not provide for distinguishing liability based on quantity. *Betkoski, supra*, at 517. The mere presence of some waste containing a CERCLA hazardous substance is sufficient to impose CERCLA's strict liability based on a release or threatened release of a hazardous substance requiring response costs. *Id.* Simply put, so long as some constituent part of the wastes disposed of at the Landfill contained some substance denominated as hazardous under § 107(a), liability under CERCLA will attach, and independent releasability of the substance, *i.e.*, without effect of an intervening force, need not be established. *Id.*, at 515.

At most, Defendants' concede the existence of material issues of fact precluding summary judgment on this issue. Defendants' Response Memorandum at 6–12. However, Defendants also assert that no witness testified that traces of "all" process materials would have been in the waste streams generated by U.S. Rubber. *Id.* at 9, 10. In particular, Defendants take issue with the report prepared by Dr. Gary Hamed, the Steering Committee's expert witness, arguing that Dr. Hamed has no experience with the chemical analysis of plant trash, performed no investigation or testing, and his findings were based on the Steering Committee's legal counsel's speculation. *Id.* at 12–13.[21] Defendants further maintain that the Steering Committee has failed to establish both that U.S. Rubber dumped its waste exclusively at the Landfill as well as the amount of waste dumped there. *Id.* at 13–14. However, thorough review of the record dem-

**21.** In this court's Decision and Order filed contemporaneously with this Report and Recommendation, Defendants' motion to exclude the opinion of Plaintiff's expert, Dr. Gary Hamed (Docket Item No. 199), is denied.

onstrates that the Steering Committee has established, as a matter of law, that U.S. Rubber generated waste containing substances considered hazardous under CERCLA, and that at least some portion of those substances were transported as waste to the Landfill.

The Steering Committee submits voluminous exhibits in support of summary judgment, including, for example, copies of correspondence between the DEC and Laidlaw and GSX Polymers and their attorneys regarding the DEC's investigation of the Landfill (*e.g.*, Pl's Exs. 32, 88), affidavits and transcripts of deposition testimony of various former employees of U.S. Rubber and the Landfill describing the rubber reclamation process, the waste generated by U.S. Rubber and its waste disposal procedures (*e.g.*, Pl's Exs. 2, 11, 12, 109, 111, 112, 113, 114, 117, 118), portions of the Landfill's business records indicating U.S. Rubber was a regular Landfill customer (*e.g.*, Pl's Ex. 3), the Cheektowaga plant's facilities and how they contributed to the generation of toxic waste (*e.g.*, Pl's Ex. 9), and various articles describing the rubber reclaiming process and resultant waste (*see, e.g.*, Pl's Exs. 4, 10, 86).[22] Included in some of these exhibits are unrefuted statements that U.S. Rubber generated substances classified under CERCLA as hazardous and that such substances were subsequently deposited into the Landfill as waste. For example, former U.S. Rubber employee Walter J. Mazur testified that some of the reclaiming oils and compounding agents used in the rubber reclaiming process, including carbon black and other substances, spilled onto the plant floor and would have been swept up as waste, deposited into a waste barrel. Pl's Ex. 58 at 30–31, 76–77.[23] Machine oil spills were sometimes part of the waste cleared from the plant's floor. *Id.* at 37–38, 74. On average, there were three fires at the plant each month and those fires were extinguished chemically. *Id.* at 41–42, 74. Afterward, the plant would be cleaned with all debris swept off the floor with squeegees and the waste water pumped into drums with the general plant waste. *Id.* at 42–45, 74. Moreover, Mr. Mazur testified that although for a time some of U.S. Rubber's waste was hauled to the Buffalo city dump, all of U.S. Rubber's waste, including "[a]ny thing they scraped off the floor," and bags and barrels of waste, was otherwise dumped into the Landfill. *Id.* at 58–60. U.S. Rubber's general office, cafeteria and janitorial wastes were also transported to the Landfill. *Id.* at 66–69. Mr. Mazur did not recall ever seeing any waste dumped at the plant. *Id.* at 61.

Other unchallenged evidence also demonstrates that U.S. Rubber generated some waste containing hazardous substances, including florescent light bulbs and ballasts (Deposition Testimony of William J. Fritton, II, Pl's Ex. 107 at 106–07), which contain mercury and PCBs.[24] For-

---

**22.** Insofar as Defendants challenge many of the Steering Committee's exhibits as inadmissible on hearsay grounds because they are not properly authenticated, Defendants' Response Memorandum at 2, n. 2, the court has limited its consideration of such to the fact that such articles containing the relevant information were published rather than for the truth of the matter reported therein. *See Shafii v. PLC British Airways*, 22 F.3d 59, 64–65 (2d Cir.1994) (holding that as affidavit submitted in opposition to summary judgment containing affiant's recollection of statements made by arbitrator was offered not for the truth of the matter asserted but to establish fact that such statements had been made, the affidavit did not constitute inadmissible hearsay, and could be considered by court).

**23.** The transcript of Mr. Mazur's deposition testimony is not among the Steering Committee's exhibits which Defendants have challenged as inadmissible as hearsay. See Defendants' Response Memorandum at 2 n. 2.

**24.** Although Defendants challenge Dr. Hamed's report on which the Steering Committee relies in support of its assertion that

mer U.S. Rubber employee Charles Zizzi testified at his deposition that while he was employed as a janitor at the Cheektowaga plant, he was required to sweep the plant floor and clean the plant. Pl's Ex. 117 at 18. Zizzi later worked in the plant's storeroom where he unloaded shipments of carbon black from boxcars, and loaded the garbage for dumping. *Id.* At 18, 22–23. The garbage that was collected daily at the plant was swept into barrels, loaded into a dump truck and dumped into the Landfill. *Id.* at 28–29, 31, 34–36.

Rather than challenging the Steering Committee's assertions that the waste U.S. Rubber generated and deposited into the Landfill contained substances considered hazardous under CERCLA, Defendants' argument in opposition to summary judgment addresses the releasability of such toxic substances. Indeed, Defendants concede that the rebuttal report of their expert witness, Dr. Ian Webber, "establishes that there are fact issues regarding 'releasability.'" Defendants' Response Memorandum at 7.

Whether a substance's hazardous components are "releasable" in a given environment, however, is a different inquiry than whether a particular substance contains a hazardous component such that the substance's presence in the Landfill qualifies as a "release, or threatened release ... of a hazardous substance" as required to make out a *prima facie* case for CERCLA liability under 42 U.S.C. § 9607(a). "It is enough that a mixture of waste solution contain a hazardous substance for that mixture to be deemed hazardous under CERCLA. The waste product itself 'need not be listed by name—instead of its constituent components—to fall within the

Act.'" *Betkoski, supra,* at 515 (quoting *Murtha, supra,* at 1201). Further, while [i]ndependent releasability is not required to establish liability ... a defendant otherwise liable may show 'nonreleasability' in order to mitigate its share of damages. It follows logically that a defendant who disposes of hazardous substances that are not independently releasable may still be held liable, even though that defendant may not be required to pay damages when the cost apportionment phase of the litigation is reached.

*Betkoski, supra,* at 516–17.

Significantly, Defendants have not produced any evidence establishing the absence of any CERCLA denominated hazardous substance within any of U.S. Rubber's waste streams. Moreover, insofar as Defendants assert that the Steering Committee has failed to establish that U.S. Rubber dumped its waste exclusively at the Landfill, the precise amount of waste dumped there and the releasability of the waste, Defendants' Response Memorandum at 13–14, such issues go to the allocation of liability and equitable sharing of response costs, an issue not before the court on summary judgment. As such, the opinion of Defendants' expert witness Dr. Ian Webber *regarding the releasability of the waste, see* Defendants' Ex. 64, is irrelevant to this aspect of the Steering Committee's contribution claim, *i.e.,* whether Defendants are liable for the cleanup of hazardous waste deposited into the Landfill by U.S. Rubber.

Accordingly, Defendants have failed to rebut the Steering Committee's proof dem-

florescent light bulbs contain mercury, Plaintiff's Memorandum at 24, the Second Circuit has recognized that florescent light bulbs contain mercury. *National Electrical Manufacturers Association v. Sorrell,* 272 F.3d 104, 107

(2d Cir.2001) (observing that Vermont statute requires florescent light bulbs to bear label indicating they contain mercury). Accordingly, the court takes judicial notice of this fact. *See* Fed.R.Evid. 201(b).

onstrating that U.S. Rubber generated waste containing CERCLA-listed hazardous substances which was deposited into the Landfill. Accordingly, summary judgment on this aspect of the motions should be GRANTED as to Plaintiff and DENIED as to Defendants.

### 4. *Capacity to be Sued*

Plaintiff's claims for contribution under § 113(f), for declaratory relief regarding the parties' specific responsibilities, and for fraudulent conveyance are asserted against both Allied and GSX Polymers. Defendants maintain that GSX Polymers lacks the capacity to be sued because all of its assets have been distributed and its corporate existence dissolved. Defendants' Memorandum at 55–56; Defendants' Reply Memorandum at 8. Defendants also dispute that there is any basis on which to hold Allied liable for any actions by U.S. Rubber, Laidlaw or GSX Polymers. Defendants' Memorandum at 54; Defendants' Reply Memorandum at 14–23.

### A. *GSX Polymers, Inc.*

Defendants maintain that when the instant action was commenced, GSX Polymers lacked the capacity to be sued because all of its assets have been liquidated and the corporate entity dissolved. Defendants' Memorandum at 55. Defendants further maintain that in the absence of a valid CERCLA claim against GSX Polymers, any claim against Allied based on a transfer of GSX Polymers' assets is barred. *Id.* at 55–56. Plaintiff, however, maintains that GSX Polymers was improperly dissolved when the instant action was filed and, as such, remains subject to CERCLA liability. Plaintiff's Response Memorandum at 36. Alternatively, Plain-

tiff asserts that even if GSX Polymers had been properly dissolved when this action was commenced, it was not dissolved when its assets were disposed of, a fact relevant to the instant analysis. *Id.* at 37.[25]

This court has held that "CERCLA preempts state capacity laws to the extent their operation would shield a dissolved corporation from CERCLA liability." *Idylwoods Associates v. Mader Capital, Inc.*, 956 F.Supp. 421, 426 (W.D.N.Y. 1997) (citing *Idylwoods Associates, supra*, 915 F.Supp. at 1303). Further, a corporation that is 'dead' but not 'buried', *i.e.*, a dissolved corporation whose assets have yet to be distributed, would fall within CERCLA's definition of a person amenable to suit under CERCLA, 42 U.S.C. § 9607(a)(2). *Idylwoods Associates v. Mader Capital, Inc.*, 915 F.Supp. 1290, 1303 (W.D.N.Y.1996).

The Steering Committee cites *Idylwoods Associates* in support of its assertion that a corporation that is both 'dead' and 'buried' is also amenable to suit under CERCLA. Plaintiffs' Response Memorandum at 36–38. However, a plain reading of this court's decision in *Idylwoods Associates*, 915 F.Supp. at 1303, shows that the court did not reach the issue. *See Idylwoods Associates, supra*, 956 F.Supp. at 426 (declining to certify to Second Circuit Court of Appeals question as to whether CERCLA preempted state capacity laws to extent that their operation would shield dissolved corporation from CERCLA liability). *Idylwoods Associates* is also distinguishable from the instant case with regard to one crucial aspect: the assets of the defendant dissolved corporation in *Idylwoods Associates* had yet to be distributed. *Idylwoods Associates, supra*, 915 F.Supp. at 1304. Accordingly, in *Idyl-*

---

**25.** The Steering Committee's papers filed in support of summary judgment address the claims for contribution and fraudulent con-

veyance only as asserted against Allied and are silent insofar as these same claims are also asserted against GSX Polymers.

*woods Associates* the defendant corporation was 'dead' but not 'buried'. *See, e.g., Oyster Bay v. Occidental Chemical Corporation*, 987 F.Supp. 182, 202–04 (E.D.N.Y. 1997) (discussing in the context of CERCLA action that 'dead and buried' corporation may be subject to action based on the trust fund doctrine or to pierce the corporate veil if it is shown that dissolution or distribution of assets occurred under fraudulent circumstances).

Moreover, whether GSX Polymers, despite being both 'dead and buried', can be subject to liability under CERCLA is merely academic. Notably, because GSX Polymers' assets have been sold and the proceeds distributed to Laidlaw, its sole shareholder, which has since been purchased by Allied, any recovery against GSX Polymers in this CERCLA action could not be collected from GSX Polymers. Instead, such judgment could only be recovered from Allied based on theories of successor liability and constructive trust or, possibly, from Allied's shareholders upon demonstrating that Allied's corporate veil should be pierced.

Nor does *State of Rio De Janeiro v. E.H. Rollins & Sons, Inc.*, 299 N.Y. 363, 87 N.E.2d 299 (1949) on which Defendants rely for the proposition that in the absence of a valid CERCLA claim against GSX Polymers, any claim against Allied based on a transfer of GSX Polymers' assets is barred, Defendants' Memorandum at 55–56, require a different outcome. At issue in *State of Rio De Janeiro, supra,* was whether a claimant could maintain an action to set aside as fraudulent a corporation's transfer of assets where any action on the underlying contract for the sale and purchase of bonds was time-barred. The court held that the action attacking the alleged fraudulent transfer was properly dismissed because it was an action for equitable relief which was "adjective and ancillary only, to the creditor's right to collect his original debt from the transferor company" which was time-barred. *Id.* at 300, 87 N.E.2d 299. In contrast, in the instant case, the CERCLA contribution claims asserted against GSX Polymers is not time-barred, having accrued with the April 9, 2001 Order on Consent, and Defendants do not assert otherwise. As such, insofar as the CERCLA contribution claim against GSX Polymers is timely, the CERCLA contribution claim against Allied is also timely. Thus, *State of Rio De Janeiro*, does not support Defendants' position; rather, by implication, it supports Plaintiff's position.

## B. *Allied Waste Systems, Inc.*

■ The Steering Committee seeks to hold Allied liable for the hazardous waste dumped into the Landfill under a theory of corporate successor liability, arguing that Allied is the successor to Laidlaw which remained responsible for any CERCLA liability attributable to U.S. Rubber after the sale of GSX Polymers' assets to U.S. Rubber Indiana and Tonson based on violations of corporate dissolution laws, fraudulent conveyance laws and Laidlaw's domination and abuse of GSX Polymers' corporate form. Plaintiff's Memorandum at 27. The Steering Committee further contends that GSX Polymers allegedly was improperly liquidated and dissolved by Laidlaw which received the proceeds of the sale of GSX Polymers' assets and Allied, upon purchasing Laidlaw on December 30, 1996, became the constructive trustee of such proceeds and also assumed all liabilities, including those imposed under § 107(a) and § 113(f), associated with the GSX Polymers and Laidlaw concerning the attempts to dissolve GSX Polymers. Plaintiff's Memorandum at 37–38.

In response to the Steering Committee's First Set of Interrogatories, Allied admit-

ted that "it is a successor to the liability, if any, of Laidlaw Waste," but denies being a successor to GSX Polymers or U.S. Rubber. Plaintiff's Ex. 80 at 4, 98. Defendants argue that the doctrine of successor liability is inapplicable to the instant case because successor liability applies only to claims against purchasers of assets while Defendants received only the proceeds of the alleged improper sale and liquidation of GSX Polymers' assets. Defendants' Response Memorandum at 15. Defendants characterize the Steering Committee's argument as asserting a claim for indirect shareholder liability, *i.e.*, based on a parent corporation's pervasive control of a subsidiary corporation's operations, which is inapplicable given that Allied never purchased the assets of GSX Polymers but, rather, only received the proceeds of GSX Polymers' liquidated assets upon purchasing Laidlaw, and that both the Supreme Court and the Second Circuit "have rejected the notion that common law claims of indirect shareholder liability are affected by CERCLA." Defendants' Response Memorandum at 15 (citing *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), and *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321 (2d Cir.2000)).

The parties do not dispute that New York and federal law regarding successor liability are largely consistent and that New York law may be relied upon in resolving such a successor liability claim under CERCLA. Plaintiff's Memorandum at

37; Defendants' Response Memorandum 15. The court thus considers whether Allied is liable as the corporate successor to Laidlaw with regard to any liability resulting from U.S. Rubber's dumping at the Landfill, given that the assets of GSX Polymers have been sold, the remaining assets distributed as dividends to Laidlaw, its sole shareholder, and GSX Polymers' corporate form dissolved.[26]

Defendants maintain that it was Laidlaw's intention, prior to purchasing GSX Polymers, that GSX Polymers would be sold and, as such, Laidlaw never undertook any steps to merge GSX Polymers into Laidlaw. In other words, GSX Polymers was a wholly-owned subsidiary of Laidlaw and was operated as a separate legal entity. It is basic law that a holding corporation is ordinarily not liable for the liabilities of the corporation whose stock it holds. 15 FLETCHER CYCLOPEDIA, CORPORATIONS, § 7131 (perm. ed.1999). More specifically, it is generally the case with regard to a parent corporation's liability for the acts of its wholly-owned subsidiary that

liability can never be predicated solely upon the fact of a parent corporation's ownership of a controlling interest in the shares of its subsidiary. At the very least, there must be direct intervention by the parent in the management of the subsidiary to such an extent that 'the subsidiary's paraphernalia of incorpo-

---

26. In support of their respective positions, the Steering Committee primarily relies on *Betkoski, supra,* for the proposition that Allied is liable under CERCLA for U.S. Rubber's disposal of hazardous substances at the Landfill. Plaintiff's Memorandum at 27–50; Plaintiff's Response Memorandum at 3–4; Plaintiff's Reply Memorandum at 18–20. Defendants argue in response that the record does not support a finding of common law indirect shareholder liability which is not affected by CERCLA. Defendants' Memorandum at 31–

32, Defendants' Response Memorandum at 15 (citing *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321 (2d Cir.2000), and *Idylwoods Assocs. v. Mader Capital, Inc.*, 177 F.R.D. 136 (W.D.N.Y.1997)). However, the court's review of the issues demonstrates that whether Allied has assumed any liability for GSX Polymers' dumping at the Landfill is best analyzed according to the fundamental tenets of corporate law.

ration, directors and officers' are completely ignored.

*Billy v. Consolidated Machine Tool Corporation,* 51 N.Y.2d 152, 432 N.Y.S.2d 879, 412 N.E.2d 934, 941 (1980) (quoting *Lowendahl v. Baltimore & Ohio R.R. Co.,* 272 N.Y. 360, 6 N.E.2d 56 (1936)).

Thus, unless the Steering Committee demonstrates that Laidlaw substantially and directly intervened in the management of GSX Polymer so as to ignore GSX Polymers' "paraphernalia of incorporation, directors and officers," neither Laidlaw nor Allied is responsible for any CERCLA liability attributed to the disposal by U.S. Rubber of hazardous substances at the Landfill.

In contrast, had GSX Polymers been merged into Laidlaw, Laidlaw would have assumed all liabilities of GSX Polymers pursuant to New York Business Corporation Law § 906 which provides that when two or more corporations merge, the surviving corporation assumes all the liabilities or obligations and penalties of the constituent corporations and no liability or obligation of such constituent corporations shall be extinguished by the merger. N.Y. Bus. Corp. Law § 906(b)(3) (McKinney 1996).[27] Nevertheless, Allied may be held liable for the dumping of hazardous substances by U.S. Rubber at the Landfill because Laidlaw, upon selling GSX Polymers' assets to Tonson and U.S. Rubber Indiana in 1987 and subsequently liquidating and dissolving GSX Polymers, assumed liability for any environmental claims arising from U.S. Rubber's dumping at the Landfill provided there is a proper legal basis for imposing such liabilities upon Allied. In particular, the Agreement for Sale of Assets executed in connection with the sale of assets to U.S. Rubber Indiana on September 1, 1987, expressly provides that:

Curtis and/or U.S. Rubber [Indiana] are assuming none of the liabilities of GSX [Polymers], and Laidlaw and GSX [Polymers] hereby jointly and severally agree to indemnify, hold harmless and defend Curtis and/or U.S. Rubber [Indiana] from all claims, losses, suits or damages, including reasonable attorney's fees, arising out of or connected with: ... (viii) any environmental matters or claims in connection with any other operations of GSX [Polymers] including, but not limited to, the "Genstar" property located in Buffalo, New York.

Pl's Ex. 36, § 12(viii), at 25–26.

Defendants maintain that Laidlaw did not, by this clause, agree to assume any liability relating to the Landfill litigation but, rather, merely agreed to indemnify U.S. Rubber Indiana as to any such litigation. Defendants' Response Memorandum at 34–35. However, the statement that Curtis and U.S. Rubber Indiana were "assuming none of the liabilities of GSX [Polymers]" establishes that such liabilities necessarily remained with the GSX Polymers and were subsequently assumed by Laidlaw upon GSX Polymers' liquidation and dissolution. The disputed environmental contamination liabilities did not 'evaporate' or transmute into a state of corporate suspended animation; rather, they ended up at Laidlaw's corporate doorstep, and that is where they remained until Laidlaw's acquisition by Allied.

 Assumption of liability agreements are enforceable under New York law. *GG Managers, Inc. v. Fidata Trust Company New York,* 215 A.D.2d 241, 626 N.Y.S.2d 488, 490 (1995) (citing *Schumacher v. Richards Shear Company, Inc.,* 59 N.Y.2d 239, 464 N.Y.S.2d 437, 451 N.E.2d 195 (1983)). Moreover, Defendants do not deny that Laidlaw expressly agreed with

---

**27.** References to N.Y. Bus. Corp. Law are to McKinney 1996, unless otherwise indicated.

regard to the sale of assets to U.S. Rubber Indiana to assume any and all liability arising out of the Landfill. Accordingly, any CERCLA liability arising out of U.S. Rubber's dumping at the Landfill was assumed by Laidlaw upon GSX Polymers' sale of assets to U.S. Rubber Indiana and its subsequent liquidation of assets and dividend distributions to Laidlaw.

As stated, the proceeds of such liquidating asset sales were included in the dividends distributed to Laidlaw and Allied has admitted in response to interrogatories that upon purchasing the stock of Laidlaw and merging with Laidlaw, it succeeded to Laidlaw's liabilities. Defendant Allied Waste Systems, Inc.'s Amended Response to Plaintiff's First Set of Interrogatories (Pl's Ex. 80), at 98 (Response to Interrogatory No. 22) ("In its answer, Allied admitted that it was formerly known as Laidlaw Waste. For this reason, Allied admits that it is a successor to the liability, if any, of Laidlaw Waste")[28]; see Allied's Answer to 4th Amended Complaint (Docket No. 116), ¶¶ 13–67 (admitting that Allied was formerly known as Laidlaw). *Rodgers v. Logan*, 121 A.D.2d 250, 503 N.Y.S.2d 36, 39 (1986) (holding that upon corporation's dissolution, the shareholders to whom are distributed the remaining assets of the corporation are said to " 'hold the assets which they received in trust for the benefit of creditors.' ") (citing *Plastic Contact Lens Co. v. Frontier of the Northeast, Inc.*, 324 F.Supp. 213, 220 (W.D.N.Y.1969), *aff'd*, 441 F.2d 67 (2d Cir.1971), *cert. denied* 404 U.S. 881, 92 S.Ct. 196, 30 L.Ed.2d 162 (1971)); *see* 16A FLETCHER CYCLOPEDIA, CORPORATIONS, § 8224 (perm. ed.1999) ("[a]ny distribution to shareholders made before satisfaction of the corporation's

debts is illegal, and corporate creditors can bring claims against the shareholders possessing the corporate assets."). It thus logically follows that Laidlaw's potential liability for the instant CERCLA litigation is now borne by Allied.

■ However, no similar evidence in the record establishes that Laidlaw also agreed to retain all responsibility for any CERCLA liability arising from the Landfill with regard to the assets sold to Tonson. Thus, the question is whether such liability remains with Laidlaw, which retained ownership of all shares of GSX Polymers and received the proceeds of the sale of GSX Polymers' assets to Tonson, or was assumed by Tonson upon its purchase of assets from GSX Polymers.

The Second Circuit has stated in the context of a CERCLA action that generally,

> a corporation acquiring the assets of another corporation only takes on its liabilities if any of the following apply: [1] the successor expressly or impliedly agrees to assume them; [2] the transaction may be viewed as a *de facto* merger or consolidation; [3] the successor is a 'mere continuation' of the predecessor; [4] or the transaction is fraudulent.

*Betkoski, supra,* at 519.

■ In other words, "CERCLA imposes successor liability," for § 107 response costs which can attach even where only a corporation's assets are purchased. *Betkoski, supra,* at 518–19 ("broad remedial purpose would be sharply curtailed if the Act [CERCLA] did not encompass successor liability").

---

**28.** Although not specifically stated in the pleadings or motion papers, the record establishes that Laidlaw was merged into Allied upon Allied's purchase of Laidlaw's stock. In particular, Allied admits that it "was formerly known as Laidlaw." Allied's Answer (Docket No. 116), ¶¶ 13 and 67. Significantly, neither Plaintiff nor Defendants suggest that Laidlaw is a subsidiary of Allied, and although Laidlaw has not been sued as a Defendant, Defendants have not asserted that Laidlaw, rather than Allied, is the proper party to this action.

Neither the Steering Committee nor Defendants have submitted any evidence tending to establish whether by purchasing some of GSX Polymers' assets, Tonson also assumed liability for the instant litigation under one of the four exceptions to the general rule that liability does not transfer upon the sale of assets, as specified by the Second Circuit in *Betkoski, supra,* at 519. Further, Tonson purchased assets from GSX Polymers, but no stock. *See* Pl's Ex. 37 (Agreement pertaining to GSX Polymers' sale of assets to Tonson in exchange for cash). Absent any evidence establishing the application of one of the four exceptions, the court applies the general rule and determines that the potential CERCLA liability arising from U.S. Rubber's dumping at the landfill was not transferred to Tonson upon Tonson's purchase of some of GSX Polymers' assets. Such liability accordingly was transferred to Laidlaw upon its receipt of GSX Polymers' liquidated assets as liquidating dividends, and subsequently was assumed by Allied upon purchasing Laidlaw. *Rodgers, supra,* at 39. Alternatively, the court is unable to determine whether any potential liability relative to the instant case rests with Allied or Tonson and this unanswered question precludes entry of summary judgment in favor of either side as to this aspect of the motions.[29]

■ The Steering Committee alternatively claims that Allied is subject to CERCLA liability based on the improper dissolution of GSX Polymers in 1992 when GSX Polymers was faced with CERCLA litigation pertaining to the Landfill, and that such improper dissolution requires the imposition of a constructive trust, initially on Laidlaw and, following Allied's stock purchase of Laidlaw, on Allied, in the amount of $ 2.8 million, representing the liquidation and distribution of GSX Polymers' assets by the 1989 and 1990 liquidating dividends to Laidlaw prior to Allied's purchase.[30] Complaint, ¶¶ 68–78, 91–93, 98–100, 177; Plaintiff's Memorandum at 32–47; Plaintiff's Reply Memorandum at 18–20. Defendants argue in opposition that Allied may not be held liable based only on Laidlaw's status as GSX Polymers' sole shareholder and, thus, recipient of the proceeds of GSX Polymers' liquidated assets. Defendants' Memorandum at 54; Defendants' Response Memorandum at 14–24. Defendants further maintain that the Steering Committee has no right to the funds transferred by the challenged dividend distributions because it was not a creditor of GSX Polymers when the distributions occurred. *Id.* The court addresses constructive trust only as an alternative theory should the District Judge disagree with the primary recommendation that Defendants GSX Polymers and Allied are liable as the corporate successors in interest to U.S. Rubber for U.S. Rubber's CERCLA claims. Discussion, *supra,* at 32–43.

■ Pursuant to New York law, a dissolved corporation can only carry on business that is necessary to wind up its affairs. N.Y. Bus. Corp. Law § 1005(a)(1).

---

**29.** The court notes that neither the Steering Committee nor Defendants assert that any liability attributable to U.S. Rubber was assumed by either U.S. Rubber Indiana or by Tonson upon their respective purchases of GSX Polymers' assets.

**30.** Under both its constructive trust theory of liability and its state law fraudulent transfer claim, the Steering Committee's recovery would be limited to the $ 2.8 million liquidating dividends. *Securities Investor Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 334 (Bankr.S.D.N.Y.1999); *Marine Midland Bank v. Murkoff,* 120 A.D.2d 122, 508 N.Y.S.2d 17, 23 (1986) (citing *Hamilton Nat. Bank v. Halstead,* 134 N.Y. 520, 31 N.E. 900 (1892)), *appeal dismissed,* 69 N.Y.2d 875, 514 N.Y.S.2d 1029, 507 N.E.2d 322 (1987).

Such business includes the distribution of assets to the shareholders, either in cash or in kind, according to each shareholder's respective rights. N.Y. Bus. Corp. Law § 1005(a)(3)(B). Prior to dissolution, however, a corporation is required to notify all creditors and claimants of the intent to dissolve so as to permit the creditors and claimants an opportunity to present to the corporation any unliquidated or contingent claims in writing, although such notice shall not be considered as "recognition that any person is a proper creditor or claimant." N.Y. Bus. Corp. Law § 1007(a). New York law further provides that no distribution of a dissolved corporation's assets may occur until "[a]fter paying or providing for the payment of its liabilities." N.Y. Bus. Corp. Law § 1005(a)(3). Moreover, the shareholders to whom the assets of a corporation are distributed upon its dissolution are liable, to the extent of its asset value, for the dissolved corporation's unsatisfied claims and are required to hold such assets in trust for the benefit of any creditors or claimants. *Rodgers, supra,* at 39 (recipient shareholders of remaining assets of dissolved corporation " 'hold the assets which they received in trust for the benefit of creditors' "); *see* 16A FLETCHER CYCLOPEDIA, CORPORATIONS, § 8224 (perm. ed.1999) (asset distribution to shareholders prior to satisfying corporation's debts is illegal, and distributed asserts are subject to claims by corporate creditors).

 A constructive trust will be imposed "when property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest." *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 122 N.E. 378, 380–81 (1919). Generally, there are four requirements for the imposition of a constructive trust: (1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment. *Sharp v. Kos-*

*malski,* 40 N.Y.2d 119, 386 N.Y.S.2d 72, 351 N.E.2d 721, 723 (1976). Because the ultimate purpose of a constructive trust is to prevent unjust enrichment, however, these factors "are simply guidelines and their rigid application is not required." *Matter of Estate of Knappen,* 237 A.D.2d 677, 655 N.Y.S.2d 110, 111, *leave to appeal denied,* 90 N.Y.2d 802, 660 N.Y.S.2d 712, 683 N.E.2d 335 (1997). Even the complete absence of any fiduciary relationship between a debtor and a creditor does not automatically defeat a creditor's claim of constructive trust under New York law if otherwise required by equity. *In re Koreag, Controle et Revision, S.A.,* 961 F.2d 341, 353–54 (2d Cir.1992). Rather, a constructive trust may be imposed whenever necessary "to satisfy the demands of justice. . . ." *Id.* "As with fraud, a constructive trust may be imposed on property obtained by bad faith." *In re Commodore Business Machines, Inc.,* 180 B.R. 72, 79 (Bankr.S.D.N.Y.1995). The funds on which imposition of a constructive trust is sought must be traceable to the event which gives rise to the constructive trust. *United States v. Peoples Benefit Life Ins. Co.,* 271 F.3d 411, 416 (2d Cir.2001).

The Steering Committee emphasizes the following undisputed facts in challenging GSX Polymers' corporate dissolution. GSX Polymers was aware as early as 1986 of the DEC's investigation into the pollution of the Landfill, and was seeking information regarding what substances U.S. Rubber dumped into the Landfill twenty years earlier. Although the Steering Committee was formed in the 1980s, GSX Polymers did not join the Steering Committee until November 6, 1995, and withdrew from it on February 25, 1999. Plaintiff's Response Memorandum at 26–27. Nevertheless, GSX Polymers, without advising any of the members of the Steering Committee, New York's Secretary of State or the DEC, sold its assets in 1987 and the

proceeds of such sale, as well as GSX Polymers' remaining assets, were distributed to Laidlaw, its sole shareholder, in 1989 and 1990 while further DEC enforcement actions against PRPs, including GSX Polymers, regarding the Landfill were proceeding. Laidlaw then took steps to formally dissolve GSX Polymers, executing a Certificate of Dissolution on November 7, 1991 which was forwarded for filing to the New York Secretary of State. Defendants do not dispute these assertions.

Defendants counter these assertions by arguing that the "request for information" letters ("information demands") received from the DEC in 1986 and 1987 regarding the Landfill were insufficient to constitute notice to Laidlaw of potential CERCLA liability stemming from U.S. Rubber's generation and disposal of its wastes at the Landfill because they did not specifically advise that GSX Polymers was considered a PRP. Defendants' Memorandum at 21–22. Further, the initial DEC information demands sought only information regarding any hazardous *waste*, as defined under the relevant New York law, that U.S. Rubber may have sent to the Landfill, which is significantly narrower than the *substances* defined as hazardous as the predicate for response cost liability under CERCLA. *Id.* This argument is without merit.

First, as Defendants concede, substances defined as hazardous under CERCLA include the substances denominated as hazardous waste under New York law, in addition to other substances. Defendants' Memorandum at 21 (comparing N.Y. Envtl. Conserv. Law § 27–1301(1) with 42 U.S.C. § 9601(14)). Accordingly, the DEC's April 29, 1986 notification that it was evaluating certain inactive hazardous waste disposal sites and that U.S. Rubber had been identified as a generator of substances considered to be hazardous wastes under New York law and disposed of at the Landfill, necessarily

implies that U.S. Rubber had also been identified as a generator of substances denominated as hazardous under CERCLA. GSX Polymers is held to the knowledge that CERCLA liability upon PRPs is both strict, and joint and several. *See State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 & n. 14 (2d Cir.1985) (discussing Congress' determination in enacting CERCLA that liability be strict, joint and several).

Second, as this court held in another CERCLA case, such information demands by a state agency are sufficient to trigger an insured's obligation to notify its insurer of an "occurrence" which may lead to litigation. *Burt Rigid Box, Inc. v. Travelers Property Casualty Corp.*, 126 F.Supp.2d 596, 628–31 (W.D.N.Y.2001) (holding information demands from DEC would have suggested to a reasonable person the possibility that claim would be asserted against it). Defendants emphasize that *Burt Rigid Box, supra,* concerned an insured's obligation to notify its insurer of an occurrence that may result in legal action and that the Steering Committee erroneously construes *Burt Rigid Box, supra,* as equating the information demands with notice of a legal claim. Defendants' Reply Memorandum at 19–20. Nevertheless, the same reasoning by which the court found in *Burt Rigid Box* that the DEC's information demands are sufficient to trigger an insured's duty to notify and advise its insurer of the potential that it may be subject to suit also dictates that the DEC's information demands informed Defendants of potential liability with regard to the Landfill, such that Defendants were required to hold GSX Polymers' assets in trust to be paid toward any CERCLA based judgment against it. Simply put, the essential fact of *notice* of *potential* liability is identical in both cases and satisfies any need for scienter to avoid injustice

by imposition of a constructive trust under New York law.

Moreover, whether the DEC's information demands mentioned an investigation of violations of only New York law or federal law is irrelevant to the fact that the demands sufficiently advised GSX Polymers that it potentially faced liability based on U.S. Rubber's dumping at the Landfill. In other words, GSX Polymers had a duty under federal common law to provide for payment of a possible liability regardless of whether such liability arose under either New York's Environmental Conservation Law or CERCLA. *See* 42 U.S.C. § 9613(f) (CERCLA liability to be determined by district court's application of federal common law). Given that imposition of such duty based on federal common law furthers CERCLA's purposes that those responsible for contaminating the environment should pay the cost of cleanup rather than the taxpayers, such principle is accepted and applies in this case as a matter of federal common law. Such duty devolved upon Laidlaw and Allied based on the subsequent transactions. Discussion, *supra*, at 157–63.

The record thus demonstrates that when GSX Polymers was dissolved and its assets liquidated and distributed, the corporation was aware, or reasonably should have been aware, it potentially faced CERCLA liability arising from U.S. Rubber's dumping at the Landfill. Nevertheless, GSX Polymers, without notifying the DEC or members of the Steering Committee, liquidated its assets, distributed the proceeds to Laidlaw, its sole shareholder, rendering GSX Polymers insolvent, and filed paperwork dissolving the corporate entity. Because the dissolution occurred while GSX Polymers had potential unsatisfied CERCLA claims, a constructive trust was imposed on its liquidated assets in the amount of $ 2.8 million. *See Republic of Philippines v. Marcos*, 806 F.2d 344, 348–

49, 355 (2d Cir.1986) (granting preliminary injunction based on claim for imposition of constructive trust where evidence presented indicated subject property had been fraudulently acquired, a fact which had yet to be proved). Thus, the funds over which a constructive trust is sought in Allied's hands flow directly from the GSX Polymer's dissolution in disregard of its status as a generator under § 107. *Peoples Benefit Life Ins., supra.*

Defendants' reliance on *City of Philadelphia v. Stepan Chemical Co.*, 713 F.Supp. 1491 (E.D.Pa.1989), and *Idylwoods Associates v. Mader Capital, Inc.*, 177 F.R.D. 136 (W.D.N.Y.1997), is unavailing as these cases are factually distinguishable from the instant case. In *Stepan Chemical Co.*, the plaintiff city notified the defendant corporation that it was seeking contribution for cleanup costs in connection with a landfill owned by the city. The defendant corporation's president, rather than responding to the request, transferred all of the company's stock to a trust in the name of his daughter and, upon his death, the company's assets were liquidated and the proceeds distributed to the trust without notifying the city. Two years later, the city filed an action against the president's estate and against the trust's trustees alleging CERCLA liability. The court dismissed the action under relevant Pennsylvania law because there was no debt due, nor any legal claim pending against the corporation when the assets were liquidated such that the city could not be considered a creditor of the corporation and the corporation thus had no duty to notify the city of its proposed dissolution. *Id.* at 1493. Notably, in contrast to the instant case, there was no allegation that the trustees intended to defraud the city by liquidating the corporation's assets and distributing them to the trust, or that conveyance to the trust was otherwise improper. *Stepan Chemical Co., supra*, at 1494. As such, the court did not consider

whether, under the circumstances, the liquidation of the corporation's assets and the subsequent distribution of the proceeds to the trust was fraudulent. Nor did the court consider whether the liquidation should be disregarded for purposes of imposing a constructive trust to render the assets subject to the city's CERCLA claims. *Id.* Here, in contrast, the undisputed facts establish that GSX Polymers was liquidated by Laidlaw both with full awareness of its likely PRP status (Laidlaw sold GSX Polymers' assets in May, June and September 1987 following the DEC's February 1987 request to it for further information regarding U.S. Rubber's operations in Cheektowaga) and, thus, potential exposure to CERCLA claims.

Defendants also cite *Idylwoods Associates v. Mader Capital, Inc.*, 177 F.R.D. 136 (W.D.N.Y.1997), for the proposition that the claims against GSX Polymers were not sufficiently ripe at the time of the dividend distribution to trigger the obligation to hold such proceeds in trust. Defendants' Memorandum at 30. However, *Idylwoods Associates* is also distinguishable on its facts. In particular, the court denied as futile a CERCLA action defendant corporation's request to amend cross-claims to assert a fraudulent conveyance claim under relevant Florida state law against another defendant corporation which had since been dissolved and its assets distributed because the moving corporate defendant was not a creditor of the dissolved corporation when the dissolution occurred and, thus, the moving defendant was not entitled to notice of the intent to dissolve. *Idylwoods, supra*, at 139. In contrast, N.Y. Debt. & Cred. Law § 276 permits an action to set aside a conveyance as fraudulent to be brought by a future creditor, *i.e.*,

one who becomes a creditor after the date of the alleged ·fraudulent conveyance, as well as by one whose cause of action arises with the fraudulent transfer and later becomes a judgment creditor. *See* Discussion, *infra*, at 60–73 (discussing N.Y. Debt. & Cred. Law §§ 273 and 276). In the instant case, unlike the circumstances in *Idylwoods*, GSX Polymers' assets were liquidated and the proceeds distributed, thus rendering GSX Polymers insolvent *before* its dissolution. Accordingly, the Steering Committee need not amend the Complaint to assert additional facts to sufficiently allege that the contribution claim based on constructive trust is ripe for judicial determination.[31]

■ The record thus establishes a constructive trust for Plaintiff's CERCLA claims was imposed on the $ 2.8 million in liquidating dividends distributed to Laidlaw, although the limitations period for enforcing a constructive trust under New York law has expired as Defendants contend. Defendants' Memorandum at 49–51; Defendants' Response Memorandum at 30. In particular, the limitations period for imposition of a constructive trust is six years and begins to run with the occurrence of the wrongful conduct or events giving rise to the right to restitution, *i.e.*, the date the wrongful withholding commences rather than the original date of the improper transfer. N.Y. Civ. Prac. L. & R. § 213(1); *Goya Foods, Inc. v. Unanue*, 233 F.3d 38, 46 (1st Cir.2000) (considering constructive trust under New York law and citing *Maric Piping, Inc. v. Maric*, 271 A.D.2d 507, 705 N.Y.S.2d 684, 685 (2000)). In the instant case, Laidlaw was required to hold the $ 2.8 million dividend distributions in trust for use in winding up GSX Polymers' business affairs and dissolution of its corporate entity. As such,

---

**31.** Additionally, in *Idylwoods Associates*, the moving defendant corporation failed to pursue a fraudulent conveyance claim against the dissolved corporation within the applicable statute of limitations. *Id.* at 140.

Laidlaw's wrongful withholding of such funds commenced on July 8, 1992, the date that GSX Polymers' certificate of dissolution was filed. The Steering Committee did not assert any claims against Allied or GSX Polymers until the Fourth Amended Complaint was filed on June 11, 1999, more than six years later. Accordingly, had the Steering Committee asserted a separate claim against Defendants for constructive trust under New York law, such claim would be time-barred.

In this case, however, the Steering Committee does not assert a separate state law claim against Defendants for constructive trust; rather, the Steering Committee asserts constructive trust as a separate basis in federal common law by which to recover on the § 113(f) contribution claim. Complaint, ¶ 177. As noted, Defendants do not contend Plaintiff's contribution claim is untimely filed, Discussion, *supra*, at 158–59, and, accordingly, the contribution claim is also timely insofar as recovery on it relies on a federal common law theory of constructive trust to facilitate enforcement of any contribution award.

To summarize, the record demonstrates that Laidlaw assumed all liability for any CERCLA litigation arising from the Landfill with regard to the sale of assets both to U.S. Rubber Indiana and Tonson and that such liability was subsequently assumed by Allied upon merging with Laidlaw. The record sufficiently establishes a constructive trust under federal common law was imposed on Laidlaw's receipt of GSX Polymers' $ 2.8 million in liquidated assets and, as the limitations period for Plaintiff's contribution action has not expired, the constructive trust may be enforced and Defendants' motion should be DENIED to that extent.

The court thus examines whether the sale of GSX Polymers' assets in 1992 and the subsequent distributions of the proceeds of such sales and GSX Polymers' remaining assets as dividends to Laidlaw in 1992 were, under New York law as the Steering Committee alleged, fraudulent. However, as this matter is before the court for report and recommendation, should the District Judge conclude that a question of material fact exists as to whether Laidlaw also retained such liability with regard to the sale of assets to Tonson, the court considers the fraudulent conveyance issue only with regard to assets of GSX Polymers sold to U.S. Rubber Indiana.

Accordingly, the court next considers whether GSX Polymers' remaining $2.8 million, the proceeds of GSX Polymers' asset sales, were fraudulently distributed as liquidating dividends to Laidlaw, its sole shareholder.

### 5. *Fraudulent Conveyance*

The Steering Committee seeks summary judgment on its Seventh Cause of Action alleging that GSX Polymers and Laidlaw, based on New York law, Allied's corporate predecessors, transferred GSX Polymers' assets to Laidlaw, without holding such funds in trust to provide for payment of any future judgment based on CERCLA and entered with regard to the Landfill. Although not alleged as such, the fraudulent conveyance claim is actually an alternative basis for relief, *i.e.*, should the court reject the Steering Committee's contribution claim based on corporate successor liability or under a theory of constructive trust, either as a separate state claim or as part of the Steering Committee's § 113(f) claim based on federal common law, success on the fraudulent conveyance claim would permit the Steering Committee to recover from Allied at least the $ 2.8 million distributed from GSX Polymers to Laidlaw.[32] Complaint, ¶¶ 184–87.

---

**32.** Defendants have not moved against the Steering Committee's state cause of action

The Steering Committee asserts its fraudulent conveyance claim under both N.Y. Debt. & Cred. Law § 276 ("§ 276") (actual fraud) and § 273 ("§ 273") (constructive fraud)(McKinney 2001).[33] An action for actual fraud requires that the challenged conveyance be made "with actual intent ... to hinder, delay, or defraud either present or future creditors," § 276, whereas an action for constructive fraud is established by showing a person conveyed assets without fair consideration, rendering the person insolvent as to creditors, § 273.

The crux of the Steering Committee's argument is that Laidlaw, by selling GSX Polymers' assets in 1987 without first providing notice to the DEC or the Steering Committee members, and subsequently distributing GSX Polymers' assets, rather than holding them in trust so as to provide for payment of potential CERCLA liability arising from U.S. Rubber's actions in connection with the Landfill, violated the statutory scheme for dissolving a New York Corporation. The Steering Committee thus maintains that the distribution of GSX Polymers' assets to Laidlaw constituted a fraudulent transaction. Defendants argue in opposition that the fraudulent conveyance claim is time-barred. Defendants' Memorandum at 40–51, 54; Defendants' Response Memorandum at 31. Defendants also maintain the DEC did not provide sufficient notice of the potential for CERCLA liability attributable to the Landfill based on U.S. Rubber's dumping until May 4, 1992, when Laidlaw first received the DEC's RD/RA notice advising that Laidlaw was considered a PRP with regard to the Landfill pursuant to New York Environmental Conservation Law (("N.Y.Envtl.Conserv.Law") § 27–1301 and CERCLA § 107(a)). Defs' Ex. 49.

### A. Statute of Limitations

Defendants argue that the fraudulent conveyance claim is time-barred by the applicable statute of limitations because it was required to be brought within six years of the date of the challenged conveyances which occurred during 1989 and 1990. Defendants' Memorandum at 49–51. Defendants further maintain that if the Steering Committee believed that the fraudulent conveyance claim accrued on dates other than the dates of the liquidating dividends, the Steering Committee was obligated to plead such facts, which it has not done. Defendants' Memorandum at 50–51. The Steering Committee maintains that although not brought within six years of the dates of the alleged fraudulent conveyances, the claim is not time-barred because it was brought within two years of their discovery, excluding the time Defendants spent in negotiations as members of the Steering Committee. Plaintiff's Reply Memorandum at 25–28. The Steering Committee also urges that Defendants are equitably estopped from asserting a statute of limitations defense. Id. at 26–27.

Ordinarily, an action for actual or constructive fraud in New York must be brought within six years of the date of the alleged fraudulent conveyance. N.Y. Civ. Prac. L. & R. § 213(8) (McKinney 1990); Wall Street Associates v. Brodsky, 257 A.D.2d 526, 684 N.Y.S.2d 244, 248 (1999). A claim for actual fraud may also be brought within two years of the date that the alleged fraudulent conveyance was, or with due diligence, could have been, discovered. N.Y. Civ. Prac. L. & R. § 203(g) (McKinney 1990); Brodsky, supra (citing cases). In this case, the filing on June 11, 1999 of the Fourth Amended Complaint in which Allied and GSX Polymers were first named as defendants occurred more than

under 28 U.S.C. § 1367 for lack of supplemental jurisdiction.

**33.** Unless otherwise stated, references to N.Y. Debt. & Cred. Law are to McKinney 2001.

six years after the dividend distributions in 1989 and 1990. Accordingly, both the actual and constructive fraudulent conveyance claims are time-barred unless the Steering Committee establishes that the actual fraud claim was filed within two years of the date that, with due diligence, it was, or could have been, discovered, or unless Defendants are equitably estopped from asserting the statute of limitations as a defense to these claims.

■■■ The Steering Committee maintains it did not know about Laidlaw's attempts to dissolve GSX Polymers until that fact was asserted as a defense to liability in a letter to the Steering Committee dated April 18, 1995. Plaintiff's Response Memorandum at 26 (citing Pl's Ex. 69). Defendants, however, argue that the Steering Committee had a duty to check public records and, upon doing so, would have discovered that GSX Polymers' Certificate of Dissolution was filed on July 3, 1992. Defendants' Reply Memorandum at 20.

That the dissolution of GSX Polymers was a matter of public record as of July 3, 1992, the date its certificate of dissolution under N.Y. Bus. Corp. Law § 1003 was filed in New York (Defs' Ex. 51) is irrelevant as to when the Steering Committee can be charged with knowledge of GSX Polymers' dividend distributions to Laidlaw. Although the Steering Committee may be charged with knowledge of such publicly filed documents, *Harris v. Wilmorite Corp.*, 266 A.D.2d 902, 697 N.Y.S.2d 439, 440 (1999) (holding plaintiff has duty to search public records), the certificate of dissolution does not reveal the distribution of the proceeds of the sale of its assets to Laidlaw. Defendants do not argue otherwise and, notably, it is possible that GSX Polymers, although dissolved in 1992, may still have had assets, *i.e.*, GSX Polymers may have been a 'dead' but not 'buried' corporation. The record thus demonstrates that the two year statute of limitations measured from the date of the discovery of the alleged fraudulent conveyance applies, and the court considers whether the actual fraud claim is timely on this basis.

The Steering Committee states that it was not aware of the dividend distributions "until Laidlaw produced documents evidencing the transfer after the parties entered into settlement negotiations, which began in November 1995." Plaintiff's Response Affidavit at 26. Although Defendants do not deny this assertion, the Steering Committee's discovery of the dividend distributions in November 1995 occurred more than two years before the Fourth Amended Complaint was filed on June 11, 1999. Accordingly, the actual fraudulent conveyance claim was not timely asserted under the two-year discovery statute of limitations, N.Y. Civ. Prac. L. & R. § 203(g), and the claim must be dismissed as time-barred unless the Steering Committee establishes that the statute of limitations was otherwise tolled or that Defendants are equitably estopped from asserting a statute of limitations defense.[34]

No basis for tolling the statute of limitations is asserted by the Steering Committee; rather, the Steering Committee maintains that Defendants are equitably estopped from interposing the statute of limitations as a defense to both the constructive and actual fraud claims because

---

**34.** The Steering Committee does not argue that the fraudulent conveyance claims would, under Fed.R.Civ.P. 15(c)(2), relate back to November 7, 1995, the date the original complaint was filed and there is no basis for such relation back. Specifically, Defendants were not sued in the original complaint and, as such, the original complaint did not give Defendants fair notice of the fraudulent conveyance claims. *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 69–70 (Apr. 1, 2002).

it was delayed from filing suit while Allied was voluntarily participating in negotiations with the Steering Committee without ceasing such negotiations. *Id.* at 26–27. The Steering Committee maintains that it waited until June 11, 1999 to file the Fourth Amended Complaint, naming Allied and GSX Polymers as Defendants, only four months after Allied withdrew from the Steering Committee on February 29, 1995. *Id.* at 27. Defendants oppose application of the doctrine of equitable estoppel, arguing that the Steering Committee has not asserted sufficient facts to support it. Defendants' Reply Affidavit at 20–23.

■■■ A defendant may be estopped from asserting the statute of limitations as a defense to a claim where the plaintiff "was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Murphy v. Wegman's Food Market, Inc.,* 140 A.D.2d 973, 529 N.Y.S.2d 648, 649 (1988) (citing *Simcuski v. Saeli,* 44 N.Y.2d 442, 406 N.Y.S.2d 259, 377 N.E.2d 713, 716 (1978), and *Arbutina v. Bahuleyan,* 75 A.D.2d 84, 428 N.Y.S.2d 99, 100 (1980)). "The mere fact that settlement negotiations have been ongoing between the parties is not sufficient to justify an estoppel." *Murphy, supra,* at 649 (citing *Procco v. Kennedy,* 88 A.D.2d 761, 451 N.Y.S.2d 487 (1982), *aff'd.* 58 N.Y.2d 804, 459 N.Y.S.2d 267, 445 N.E.2d 650 (1983)). Rather, "[t]o be entitled to an estoppel, the plaintiff must show that by engaging in protracted settlement discussions, defendant intended to lull the plaintiff into inactivity and to induce plaintiff to continue negotiations until after the statute of limitations had run." *Murphy, supra* (citing *Triple Cities Constr. Co. v. Maryland Cas. Co.,* 4 N.Y.2d 443, 176 N.Y.S.2d 292, 151 N.E.2d 856 (1958); and *Procco, supra* ).

■■■ In this case, the record does not demonstrate that the Steering Committee's failure to assert the fraudulent conveyance claim "was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Wegman's, supra,* at 649. Rather, the Steering Committee asserts only that its involvement in settlement negotiations prevented it from filing suit. Plaintiff's Response Memorandum at 26. Notably, the Steering Committee does not reference any document establishing that the individual members of the Steering Committee had agreed not to commence legal action against any other Steering Committee member during negotiations and the court is unaware of any reason why the commencement of such an action would have interfered with the ongoing settlement negotiations. Nor do any of the exhibits submitted in connection with the summary judgment motions demonstrate the existence of any such facts. A party asserting equitable estoppel is required to allege facts in support of estoppel, *T & N PLC v. Fred S. James & Co. of New York, Inc.,* 29 F.3d 57, 61 (2d Cir. 1994) (holding defendant was not equitably estopped from asserting statute of limitations as defense absent allegation that defendant wrongfully induced plaintiff from commencing its action), which the Steering Committee has not done. The Steering Committee has not submitted anything indicating what additional facts, *e.g.,* that Defendants negotiated in bad faith so as to lull the Steering Committee into a false belief that there was no need to file a protective action, it would allege in support of equittable estoppel if permitted to file a further amended complaint, and the fact that there is no indication of such facts within the more than 200 exhibits of record on the summary judgment motions demonstrates that no such facts exist.

In sum, the record does not support a finding that Defendants are equitably estopped from asserting the statute of limitations as a defense to this action. Summary judgment as to this aspect of the

motions should be GRANTED in favor of Defendants. Because this case is before the court for a report and recommendation on the summary judgment motions, the court addresses the other arguments regarding the fraudulent conveyance claim in the event the District Judge finds that the claim is not time-barred.

Should the District Judge reach the merits of the fraudulent conveyance claim, the court considers whether summary judgment can be granted in favor of any party with regard to either actual or constructive fraud. In this case, the record establishes that summary judgment should be granted in favor of the Steering Committee insofar as it alleges a constructive fraud claim, although as discussed, *infra*, the existence of issues of material fact prevent granting summary judgment in favor of any party on the actual fraud claim.

### B. *Constructive Fraud*

With regard to a constructive fraud claim, New York law provides

[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation incurred without fair consideration.

N.Y. Debt. & Cred. Law § 273.

There are two elements of a constructive fraud claim, including (1) the conveyance was made without fair consid-

eration; and (2) the transferor was or by the conveyance was rendered insolvent.[35] *Sklaroff v. Rosenberg*, 125 F.Supp.2d 67, 73 (S.D.N.Y.2000); *see* N.Y. Debt. & Cred. Law § 273. Consideration received in exchange for property or an obligation is "fair" when "as a fair equivalent thereof, and in good faith, property is conveyed or an antecedent debt is satisfied;" or when it "is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property, or obligation obtained." N.Y. Debt. & Cred. Law § 272. An entity is considered insolvent "when the present fair salable value of [its] assets is less than the amount that will be required to pay [its] probable liability on [its] existing debts as they become absolute and matured." N.Y. Debt. & Cred. Law § 271(1). " 'Debt' includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." N.Y. Debt & Cred. Law § 270. Additionally, a dividend distribution can be set aside as fruits of a fraudulent conveyance. *Sunrise Industrial Joint Venture v. Ditric Optics, Inc.*, 873 F.Supp. 765, 772 (E.D.N.Y.1995) (finding fraudulent conveyance claim sufficiently stated where complaint asserted facts challenging as fraudulent sale of corporation's assets and subsequent conveyance of sale's proceeds as dividend to shareholder).

In the instant case, the Steering Committee argues that the two dividend distributions of the proceeds of the sale of

---

**35.** Unlike a claim for actual fraud, an intent to defraud is not an element of a constructive fraud claim. *Sklaroff, supra*, at 74 (citing *Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 82 (2d Cir.1996), *aff'd*, 18 Fed.Appx. 28 (2d Cir.2001) (Table); *Schmitt v. Morgan*, 98 A.D.2d 934, 471 N.Y.S.2d 365, 366–67 (1983) (under N.Y. Debtor and Creditor Law, any transfer made by insolvent debtor for less than fair consideration is fraud as against creditors without regard to actual intent of

transferee), *appeal dismissed*, 62 N.Y.2d 914, 479 N.Y.S.2d 9, 467 N.E.2d 893 (1984)). As such, that Defendants may have lacked the intent to defraud the Steering Committee when proceeds of the sale of GSX Polymers' assets were distributed as dividends to Laidlaw in 1989 and 1990 is irrelevant to whether such distribution constituted a constructively fraudulent conveyance as to the Steering Committee's probable contribution claim against a PRP or the Landfill.

GSX Polymers' assets constituted constructively fraudulent conveyances because GSX Polymers received no consideration for the dividends which rendered it insolvent. Plaintiff's Memorandum at 51–52. Defendants do not dispute that Laidlaw gave no consideration in exchange for receiving the sale proceeds and that such distributions rendered GSX Polymers insolvent; rather, Defendants argue that the Steering Committee incorrectly questions the lawfulness of the challenged transfers under a subjective test. Defendants' Response Memorandum at 30–31.

■ The Steering Committee, by this contribution action, seeks an adjudication as a judgment creditor of Defendants. That the Steering Committee has yet, in the instant action, to attain that status, however, does not prevent it from being considered a present creditor of GSX Polymers, Laidlaw and Allied as a cause of action for constructive fraud under § 273 accrues with the occurrence of the alleged fraudulent conveyance. *Brodsky, supra,* at 248; *see Shelly v. Doe,* 249 A.D.2d 756, 671 N.Y.S.2d 803, 805 (1998).

Several of the issues present in the instant case were before the court in *Shelly.* In *Shelly,* a victim of sexual abuse in 1993, sued the perpetrator in a civil action, culminating in a 1997 judgment in excess of $ 600,000. *Shelly, supra,* at 805. Prior to the civil action, the perpetrator pleaded guilty in 1994 to sexual abuse charges and was ordered to either surrender certain valuable firearms he owned to the police or to transfer the firearms to another person. *Id.* The perpetrator instead sold the firearms for less than fair consideration and when the victim, in an attempt to collect on the judgment, issued an execution to the county sheriff directing him to levy upon the perpetrator's interest in the firearms, the perpetrator commenced a special proceeding seeking a declaration that the transfer was not a fraudulent conveyance

under N.Y. Debt. & Cred. Law §§ 273 or 276. *Id.*

The court held that as the challenged conveyance occurred in 1994, prior to the victim's judgment against the perpetrator, the victim's cause of action arose at the time of the tort based on the perpetrator's sexual abuse and the victim met the "broad definition" of a creditor as being "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." *Id.* at 805 and n. 3 (citing cases and N.Y. Debt. & Cred. Law § 270). Nevertheless, the victim's entitlement to relief depended on whether the defendant was rendered insolvent by the property transfer for less than its fair value. *Id.* at 805–06. The perpetrator's sworn statement establishing his solvency as of December 1994, when the transfer occurred, was challenged by the victim on the basis it did not take into consideration his probable liability on his existing debt stemming from the sexual abuse in 1993. *Id.* at 806. The court held that the perpetrator was not required to consider his probable liability in calculating his net worth because such liability was entirely speculative when the sexual abuse occurred in 1993 and remained such until judgment was obtained in 1997. *Id.* Accordingly, the victim failed to establish the transfer when made rendered the perpetrator insolvent, precluding any claim for constructive fraud. *Id.*

Similarly, that the conveyance in the instant case occurred before any legal action was filed which would render the Steering Committee, if successful, a judgment creditor of Defendants does not necessarily preclude the constructive fraud claim. *See Shelly, supra,* at 805 (defendant's conveyance of property absent fair consideration and with awareness of potentially incurring debt beyond his ability to pay renders conveyance fraudulent as to both present and future creditors). In-

stead, with the occurrence of the challenged conveyances in 1989 and 1990, the Steering Committee obtained an unmatured claim, contingent upon its being adjudicated a judgment creditor. *See Shelly, supra,* at 805 (plaintiff's claim against defendant for money damages stemming from criminal assault was unmature pending adjudication in civil action). However, in contrast to *Shelly,* where the court found that the perpetrator's probable liability was too speculative as to require factoring it into the perpetrator's net worth, here, the fact of Defendants' probable liability, as a PRP subject to CERCLA contribution claims for § 107 response costs, was already established in 1989 and 1990 under the trust fund doctrine when GSX Polymers' liquidating dividends were distributed. *See Allen Morris Commercial Real Estate Services Company v. Numistatic Collectors Guild, Inc.,* 1993 WL 183771, *8 (S.D.N.Y. May 27, 1993) (discussing term "probable liability" includes contractual contingent liabilities such as guaranties and lease obligations); *compare Staten Island Savings Bank v. Reddington,* 260 A.D.2d 365, 687 N.Y.S.2d 707, 709 (1999) (holding mere existence of contingent debt is, without more, insufficient to support finding that such debt qualifies as "probable liability" within meaning of New York Debtor & Creditor Law; there must be some evidence proffered as to probability, at time of challenged conveyance, that contingent liability will be imposed and, if so, in what amount). Here, evidence has been proffered as to both the probability that a contingent liability attached when the dividends were distributed in 1989 and 1990, as well as the amount of those dividends.

Notably, GSX Polymers became insolvent upon distributing the proceeds of the sale of its assets in the form of dividends to Laidlaw, its sole shareholder, in 1989 and 1990 as such distributions left GSX Polymers without any assets. However,

as discussed, *supra,* at 162–67, GSX Polymers, through Allied as the sole recipient of proceeds of GSX Polymers's liquidated assets, through merger with Laidlaw, remained liable under the trust fund doctrine for U.S. Rubber's dumping at the Landfill. Although the amount of Defendants' CERCLA liability may not have been capable of exact determination when the dividends were paid, because GSX Polymers held no assets, it was unable to satisfy even a nominal judgment.

Accordingly, alternatively, the Steering Committee is entitled to recover on its constructive fraud claim and summary judgment should be GRANTED in its favor as to this aspect of the motions. *See Sklaroff, supra,* at 74 (granting summary judgment in favor of plaintiff on constructive fraud claim where record demonstrated defendant was rendered insolvent by transfer of assets for less than fair consideration).

### C. *Actual Fraud*

Material issues of fact, however, prevent entry of summary judgment as to either party with regard to the Steering Committee's actual fraud claim. In particular,

[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

N.Y. Debt. & Cred. Law § 276 (emphasis added).

"A transfer made with actual intent to defraud is fraudulent, regardless of whether the debtor receives fair consideration." *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F.Supp. 913, 934 (S.D.N.Y.1995) (citing *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 635 (2d Cir.1995)). The burden of proving actual intent is on the party seeking to set it aside, *United States v. McCombs,* 30

F.3d 310, 328 (2d Cir.1994), and must be demonstrated by clear and convincing evidence. *Frank, supra,* at 639.

■ Nevertheless, "direct proof of actual intent is rare, [and] creditors may rely on 'badges of proof' to establish an inference of fraudulent intent." *Shelly, supra,* at 806 (quoting *Pen Pak Corp. v. La Salle Nat'l Bank of Chicago,* 240 A.D.2d 384, 658 N.Y.S.2d 407, 408 (1997)). Factors considered as circumstantial proof include: "(1) a close relationship between the parties to the transaction, (2) a secret and hasty transfer not in the usual course of business, (3) inadequacy of consideration, (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it, (5) the use of dummies or fictitious parties, and (6) retention of control of the property by the transferor after the conveyance." *Shelly, supra* (citing *MFS/Sun Life Trust–High Yield Series, supra,* at 935). These factors will vary according to the specific circumstances of a given case with the indicia of fraud increasing with the presence of multiple factors. *MFS/Sun Life Trust–High Yield Series, supra.* Furthermore, a voluntary dissolution of a corporation by its officers and directors without compliance with applicable provisions of the applicable New York Business Corporation Law and without the equal distribution of assets to creditors constitutes fraud, as a matter of law, on the part of those corporate officers. *Beol, Inc. v. Dorf,* 22 Misc.2d 798, 193 N.Y.S.2d 394, 399 (1959) (citing *Home Indemnity Co. v. Filyork Holding Corporation,* 258 A.D. 962, 16 N.Y.S.2d 726, *aff'd* 283 N.Y. 728, 28 N.E.2d 963 (1940)), *aff'd* 12 A.D.2d 459, 209 N.Y.S.2d 267, *reargument and appeal denied,* 12 A.D.2d 616, 210 N.Y.S.2d 753 (1960), *appeal dismissed,* 9 N.Y.2d 963, 218 N.Y.S.2d 43, 176 N.E.2d 499 (1961).

■ The Steering Committee asserts that Laidlaw's dissolution of GSX Polymers was accompanied by the knowledge that GSX Polymers faced CERCLA liability with regard to the Landfill, providing strong circumstantial evidence of an actual intent to defraud. Plaintiff's Memorandum at 47–48; Plaintiff's Response Memorandum at 22–23. In particular, the Steering Committee points to evidence demonstrating Laidlaw's awareness of the potential liability stemming from the Landfill when it purchased GSX Polymers in 1986, when it corresponded with the DEC in 1987 in connection with the ongoing investigation of the hazardous waste deposited into the Landfill, and upon receiving mailings in 1988 and 1989 regarding the ongoing Remedial Investigation and Feasibility Study ("RI/FS") activities at the Landfill. Plaintiff's Memorandum at 48; Plaintiff's Response Memorandum at 22 (both citing Pl's Ex. 96 (March 4, 1996 Affidavit of Laidlaw Senior Vice–President & General Counsel Ivan R. Cairns), ¶¶ 20–23); Pl's Exs. 32–35 (Correspondence between Mr. Cairns and the DEC between January 31 and March 30, 1987 regarding the DEC's information demands as to what substances generated by U.S. Rubber were deposited into the Landfill); Pl's Exs. 48–53 (DEC letters issued between July 1988 and October 1989 and notifying Concerned Citizens of public informational meetings to discuss remediation of the Landfill), Pl's Ex. 58 (DEC's Proposed Remedial Action Plan dated November 1991); and Pl's Ex. 84 (August 18, 1986 letter from Huber Lawrence & Abell, attorneys for Pfohl Brothers Site Steering Committee to Potentially Responsible Parties, Pfohl Brothers/ Aero Drive Landfill, regarding participation in interim emergency measures and initial planning regarding the Landfill); [36] *see*

36. The Steering Committee initially referenced in support of this statement to Pl's Ex.

*also* Plaintiff's Reply Memorandum at 25 (citing Pl's Exs. 27 (document dated July 17, 1986 entitled "GSX Corporation Litigation Update" and categorizing DEC's inquiry as to whether U.S. Rubber sent hazardous waste to the Landfill as a "Superfund" claim)); Pl's Exs. 29–30 (DEC letters to GSX Polymers and U.S. Rubber, dated August 15, 1986 and April 29, 1986, respectively, concerning investigation into the Landfill); Pl's Exs. 32–35, *supra*, Ex. 98 (various internal GSX Polymers/Laidlaw documents dated 1986–87 and referring to the Landfill as a Superfund issue); Pl's Ex. 38 (September 11, 1987 Memorandum from GSX Polymer's President LaGrone to Laidlaw corporate counsel Fowler itemizing matters requiring legal attention, including "Pfohl Bros. Landfill—Super Fund cleanup case where they are trying to stick U.S. Rubber for dumping from a plant that was closed 30 years ago"); and Ex. 102 (May 1, 2001 Declaration of DEC licensed professional engineer Robert W. Schick attesting as to various mailings sent by the DEC between 1987 and 1989 regarding the Landfill and progress of activity concerning the Remedial Investigation/Feasibility Study).

Nevertheless, Laidlaw, on November 13, 1989 and within four weeks of receiving the DEC's letter regarding the release of the proposed Remedial Action Plan at the Landfill, decided to liquidate GSX Polymers and distribute the liquidation proceeds and other funds remaining on its books to Laidlaw. Plaintiff's Memorandum at 49; Plaintiff's Response Memorandum at 22 (both citing Pl's Exs. 53–55, respectively, October 1989 DEC notice to Concerned Citizens; GSX Polymers' Corporate Resolution dated August 31, 1989 declaring $ 2,588,650 dividend to be issued August 31, 1989; and Whittaker's November 13, 1989 Memorandum to Sandwell and van Wyck directing transfer of $ 2,588,650 in retained earnings from GSX Polymers to Laidlaw on September 6, 1989, and bearing handwritten notation that corporate resolution consistent with that direction should be prepared); Pl's Ex. 58 (DEC's Proposed Remedial Action Plan dated November 1991).

When deposed in connection with this case, Whittaker was unable to justify or explain her direction that the conveyance be backdated to September 6, 1989. Plaintiff's Memorandum at 49 (citing Pl's Ex. 116 at 167–68) (September 20, 2000 Deposition of Whittaker); *See* Plaintiff's Reply Memorandum at 26 (citing Pl's Supp. Ex.[37] 1 at 252) (November 9, 2000 Deposition Testimony of Mr. Cairns); Pl's Supp. Ex. 2 at 167–68 (same as Pl's Ex. 116 at 167–68). Whittaker also directed a second transfer of GSX Polymers' remaining assets available from a pension plan refund. Plaintiff's Memorandum at 49; Plaintiff's Response Memorandum at 26 (citing Pl's Ex. 57, Whittaker's April 9, 1990 Memorandum to Sandwell and van Wyck directing transfer of $ 207,853 from GSX Polymers to Laidlaw on June 1, 1990, for pension refund of excise tax, and bearing handwritten notation that GSX Polymers "should then be dissolved. Tom did not want it merged."). The second transfer rendered GSX Polymers insolvent and Laidlaw officers testified at their respective depositions that they were unaware of any due diligence undertaken to ensure

86, a column from an undated issue of RUBBER WORLD, entitled *Reclaim rubber usage and trends*, apparently in error. Further, the Steering Committee does not explain how the *November 1991* Proposed Remedial Action Plan (Pl's Ex. 58) is relevant to Laidlaw's awareness of potential liability for the Landfill upon purchasing GSX Polymers in *1986* and the subsequent sale of its assets in *1987*.

**37.** References to "Pl's Supp. Ex." are to the two volumes of supplemental exhibits Plaintiff submitted on July 27, 2001, in further support of summary judgment.

that the transfers were appropriate, *i.e.*, the existence of actual or potential creditors including the Steering Committee. Plaintiff's Memorandum at 49; Plaintiff's Response Memorandum at 26. According to the Steering Committee, had Mr. Cairns inquired of any former U.S. Rubber Cheektowaga plant employees or Landfill employees, he would have learned of the hazardous waste constituents within U.S. Rubber's waste stream. Plaintiff's Reply Memorandum at 26 (citing Pl's Supp. Exs. 11–14 and 16) (transcripts of depositions respectively of former U.S. Rubber employees Zenon Sucharski, William J. Fritton, II, Kenneth E. Ruppert, Walter J. Mazur and Walter Nalewajek); and Pl's Exs. 107, 109 and 117 (transcripts of depositions respectively of U.S. Rubber employee William J. Fritton, II, and Landfill employee Albert Francis Lavocat, and U.S. Rubber employee Charles Zizzi).

According to the Steering Committee, these events demonstrate the necessary elements for an actual fraud claim, including that (1) the $2.8 million was transferred from GSX Polymers to Laidlaw when Laidlaw was its sole shareholder; (2) no notice of the dividend distributions or the corporate dissolution was given; and (3) the dividend distributions left GSX Polymers insolvent and a mere corporate shell. *Id.* at 49–50. The Steering Committee further maintains these events are strong circumstantial evidence of actual fraud under § 276 to support summary judgment in its favor. *Id.* at 50.

Defendants argue that the Steering Committee has misstated the relevant caselaw and facts and that the undisputed facts establish the complete absence of fraudulent intent. Defendants' Response Memorandum at 25–26. In particular, Defendants assert that the undisputed facts establish that (1) the decision to issue the dividends were part of Laidlaw's pre-acquisition business plan to sell GSX Poly-

mers and were made in the normal course of business, (2) Ms. Whittaker first learned of the concerns regarding the Landfill from in-house counsel years after the transfers; (3) the decision to dissolve GSX Polymers was made by Mr. Cairns more than 2 ½ years after the March 1987 response to the DEC's information requests and before the DEC's 1992 PRP notification letter; and (4) although Mr. Cairns' testimony is supported by documents identifying sites where Laidlaw and its subsidiaries were named as PRPs, the Landfill was not included on such documents until 1992, the first year Laidlaw was named as a PRP. *Id.* at 26 (citing Defs' Exs. 1–4) (deposition testimony of Cairns, LaGrone, Whittaker and Fowler); Defs' Ex. 5 (March 4, 1996 Affidavit of Cairns); Defs' Ex. 32 (June 2, 1987 Agreement to sell certain GSX Polymers assets to Tonson); Defs' Ex. 36 (September 1, 1997 Agreement for Sale of Assets from GSX Polymers to U.S. Rubber Indiana); Defs' Ex. 39 (October 23, 1987 Internal Memorandum by Laidlaw officer Norris regarding recent trip to Vicksburg to review purchase accounting); Defs' Ex. 41 (August 31, 1999 GSX Polymers Corporate Resolution declaring $ 2,588,650 dividend); and Defs' Ex 42 (November 13, 1989 Whittaker memorandum to Sandwell and van Wyck directing $ 2,588,650 dividend distribution, effective September 6, 1989); Defs' Ex. 43 (April 16, 1990 Whittaker memorandum to Cairns that Fowler indicated all GSX Polymers litigation was resolved, the pension plan was terminated and requesting permission to merge GSX Polymers with Laidlaw and bearing handwritten notation that GSX Polymers must be liquidated, rather than disposed of "via the merger route"); Defs' Ex. 44 (April 9, 1990 Whittaker memorandum to Sandwell and van Wyck directing dividend distribution of $207,853 declared as of June 1, 1990 representing pension plan refund); Defs' Ex. 45

(August 31, 1991 list of PRPs and associated hazardous waste sites; the Landfill in not among them); Defs' Ex. 48 (notes from third quarter 1991 listing PRPs, but not Laidlaw or GSX Polymers); Defs' Ex. 49 (May 4, 1992 DEC letter to Laidlaw advising of its PRP status with regard to the Landfill); and Defs' Ex. 52 (notes dated April 1993 listing PRPs, including the Landfill); *see also* Defendants' Memorandum at 14–17 and 47–49 and Defendants' Reply Memorandum at 6 (citing to same Defs' exhibits).

Defendants maintain that although the Steering Committee asserts Laidlaw was aware of the potential CERCLA liability stemming from the Landfill upon purchasing GSX Polymers in 1986, Plaintiff's citation to Mr. Cairns's affidavit in support is erroneous as Mr. Cairns stated to the contrary. Defendants' Response Memorandum at 27 (citing Defs' Ex. 5 at ¶ 23) (acknowledging awareness of various correspondence between the DEC and Laidlaw/GSX Polymers as well as internal memoranda regarding such correspondence, but denying that such documents establish that the DEC had made any claim that U.S. Rubber sent hazardous waste to the Landfill). As to the Steering Committee's assertion that Laidlaw was aware of the potential liability in 1986 when it communicated repeatedly with the DEC about the ongoing investigation at the Landfill, the Steering Committee refers only to the DEC's letters advising of the DEC's investigation into the hazardous *waste* disposed of at the Landfill. *Id.* Defendants take issue with the Steering Committee's references to DEC mailings during 1988 and 1989 because the Proposed Remedial Action Plan ("PRAP") was not issued until 1991 and because the record does not establish Laidlaw ever received the mailings. *Id.*

Defendants also challenge the Steering Committee's assertion that the decision to distribute the 1989 dividend occurred within weeks of the DEC's release of the PRAP given that the PRAP was issued two years later in November 1991. *Id.* at 27–28. As to the Steering Committee's observation that Whittaker "backdated" the 1989 dividend distribution, Defendants explain that the intent was to have the distribution coincide with the end of GSX Polymers' fiscal year. *Id.* at 28 (citing Defs' Ex. 3) (Whittaker deposition testimony). Defendants also point out that Whittaker testified that she was not aware of the Landfill issue until years later. *Id.* Defendants further assert that there is no evidence that GSX Polymers' November 7, 1991 Certificate of Dissolution was prepared by Mr. van Wyck and Mr. Norris after the DEC issued the PRAP. *Id.* at 29. Finally, as to the Steering Committee's assertion that certain Laidlaw officers gave deposition testimony indicating they were unaware of any due diligence undertaken with regard to the dividend distributions, Defendants point out that other Laidlaw employees testified that they were unaware of any financial, legal or other reason not to issue the dividends. *Id.*

The plethora of evidence pertaining to the actual fraud claim on both sides demonstrates that material issues of fact preclude granting summary judgment to any party on this issue. In other words, resolution of the issue requires consideration of all the evidence and weighing the facts presented in favor of each side, a task from which the court is forbidden on summary judgment. *See Shelly, supra,* at 758, 671 N.Y.S.2d 803 (issues of material fact regarding intent precluded summary judgment as to actual fraud claim). Accordingly, summary judgment on the issue of actual fraud should be DENIED as to both Plaintiff and Defendants.

### 6. *Piercing the Corporate Veil*

The Steering Committee seeks to pierce GSX Polymers' corporate veil to hold Al-

lied (through its merger with Laidlaw) responsible for more than the $ 2.8 million it received from the dividend distributions, *i.e.*, any additional amounts owed to the Steering Committee based on its § 113(f) claim. Plaintiff's Memorandum at 52.[38] According to the Steering Committee, Laidlaw's "egregious misconduct in regard to GSX Polymers justifies piercing the corporate veil and holding Allied fully responsible for the liabilities of this subsidiary." *Id.* Defendants maintain there is no evidence that Laidlaw disregarded GSX Polymers' corporate form so as to warrant piercing the corporate veil. Defendants' Memorandum at 37.

 The court's power to pierce a corporation's veil so as to hold the parent corporation liable for the actions of its subordinates applies in CERCLA actions. *Bestfoods, supra,* at 62, 118 S.Ct. 1876. As GSX Polymers is a New York corporation, whether to pierce its corporate veil is determined as a matter of New York law.[39] Further, although "the issue of corporate disregard is generally submitted to the jury," *American Protein Corporation v. AB Volvo,* 844 F.2d 56, 59 (2d Cir.1988), the issue may be decided on a motion for summary judgment where the record fails to establish the existence of .a triable issue of fact as to whether the corporate veil should be pierced. *See Potash v. Port Authority of New York and New Jersey,* 279 A.D.2d 562, 719 N.Y.S.2d 290, 291 (2001) (granting defendants' motion for summary judgment which plaintiff failed to oppose with any evidence raising triable issue as to whether parent corporation so dominated subsidiary corporation as to

warrant piecing subsidiary's corporate veil); *Katz v. N.Y. Tint Taxi Corp.,* 213 A.D.2d 599, 624 N.Y.S.2d 65, 66 (1995) (affirming granting of summary judgment in favor of defendant sole owner and shareholder of co-defendant corporation where plaintiff failed to meet burden of establishing any basis for piercing corporate veil); *Sovereign Metal Corporation v. Ciraco,* 210 A.D.2d 75, 621 N.Y.S.2d 296, 296–97 (1994) (affirming granting of summary judgment in favor of defendant parent corporation where nothing in plaintiff's pleadings or motion papers addressed necessary elements to pierce corporate veil).

 Courts are reluctant under New York law to disregard the corporate form distinguishing two affiliated corporate entities. *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club International, Inc.,* 2 F.3d 24, 26 (2d Cir.1993). Rather, New York law permits a court to pierce the corporate veil of one corporation to reach the assets of an affiliated corporation only where the plaintiff demonstrates both "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *American Fuel Corporation v. Utah Energy Development Company,* 122 F.3d 130, 134 (2d Cir.1997). "While complete domination of the corporation is the key to piercing the corporate veil, ... such domination, standing. alone, is not enough; some showing of a wrongful or unjust act toward [the party seeking piercing] is required." *Morris v. New York State Dep't of Taxation & Fin.,*

---

**38.** As discussed, *supra,* at 157–67, if CERCLA liability is imposed upon Allied based on merger with Laidlaw, piercing GSX Polymers' corporate veil to reach Allied is rendered an alternative basis for such liability.

**39.** The parties agree that New York's veil piercing standard is substantively similar to

the federal standard and, as such, the court need not choose between applying New York or federal law. Plaintiff's Memorandum at 53; Defendants' Response Memorandum at 31.

82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1161 (1993) (citing *Walkovszky v. Carlton*, 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6, 8 (1966); and *Guptill Holding Corp. v. State*, 33 A.D.2d 362, 307 N.Y.S.2d 970, 972–73 (1970), *aff'd*, 31 N.Y.2d 897, 340 N.Y.S.2d 638, 292 N.E.2d 782 (1972)).

 Here, the court has already determined that if the fraudulent conveyance claims were not time-barred, the record sufficiently establishes that GSX Polymers' 1989 and 1990 dividend distributions, as directed by Laidlaw officials, were constructively fraudulent, but that issues of fact preclude a determination as to whether such distributions constitute actual fraud. Discussion, *supra*, at 172–78. As such, the second prong of the corporate veil piercing test is met provided such fraud resulted from Laidlaw's complete domination over GSX Polymers with regard to the distributions. Accordingly, the court considers the amount of control Laidlaw exercised over GSX Polymers.

Whether one corporate entity completely dominates a subsidiary corporate entity depends on several factors. "In considering whether or not to pierce the corporate veil under CERCLA, courts have considered several factors, including, in approximate descending order of importance: (1) inadequate capitalization in light of the purposes for which the corporation was organized; (2) extensive or pervasive control by the shareholder or shareholders; (3) intermingling of the corporation's properties or accounts with those of its owner; (4) failure to observe corporate formalities and separateness; (5) siphoning of funds from the corporation; (6) absence of corporate records; and, (7) nonfunctioning officers or directors." *City of New York v. Exxon Corporation*, 112 B.R. 540, 553 (S.D.N.Y.1990) (quoting *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F.Supp. 22, 33 (D.Mass.1987)),

*aff'd in part*, 932 F.2d 1020 (2d Cir.1992). "No one of these factors is either necessary or sufficient to disregard corporate separateness. The equitable decision to pierce the veil is dependent on the facts peculiar to each case." *Acushnet, supra,* at 33.

In the instant case, the record does not support finding that Laidlaw so completely dominated GSX Polymers as to satisfy the first prong of the veil-piercing analysis and permit the court to pierce GSX Polymer's corporate veil, thereby holding Laidlaw liable for GSX Polymers' CERCLA liabilities and to thus hold Allied, as Laidlaw's successor in interest, ultimately liable. Both parties have submitted much evidence in support of their respective summary judgment motions. A careful review of the record indicates that much of the evidence on which the Steering Committee relies pertains to whether Laidlaw's control over GSX Polymers subjects Laidlaw to CERCLA operator liability rather than to whether Laidlaw so abused GSX Polymers' corporate form as to warrant piercing its corporate veil and holding Laidlaw liable for GSX Polymers alleged misdeeds. *See Bestfoods, supra, passim.* This distinction is crucial as CERCLA liability may be directly imposed on a parent as an operator only where the parent operates a *facility* for purposes of a § 107 claim, in contrast to indirectly by piercing the corporate veil where the parent operates the *subsidiary* which operates a facility. *Id.* at 67–69, 118 S.Ct. 1876.

With regard to the first factor, the Steering Committee maintains that the fact that the sale agreement for GSX Polymers' Vicksburg, Mississippi plant provides for Laidlaw to indemnify the purchaser for any environmental liabilities associated with the Landfill and the Cheektowaga plant demonstrates that GSX Polymers was inadequately funded; other-

wise, there would be no need for Laidlaw to agree to such indemnification. Plaintiff's Memorandum at 54; Plaintiff's Response Memorandum at 30–31. The Steering Committee further maintains that GSX Polymers' inadequate capitalization is evidenced by Laidlaw's decision to transfer all of GSX Polymers' funds to Laidlaw in the form of dividend distributions which left GSX Polymers insolvent and unable to pay any CERCLA liability debt. Plaintiff's Response Memorandum at 30–31. Defendants argue in opposition that although Laidlaw agreed to indemnify the purchaser in the event of liability based on eight separately enumerated matters, such agreement does not establish that GSX Polymers was inadequately capitalized for the purpose of its rubber reclaiming operations. Defendants' Reply Memorandum at 34.

Significantly, the inadequate capitalization factor pertains only to capitalization "in light of the purposes for which the corporation was organized." *Exxon Corp.*, *supra*, at 553; *see also Idylwoods Associates*, *supra*, 915 F.Supp. at 1305. *Compare Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 142 (2d Cir.1991) (construction firm's undertaking multimillion dollar construction project despite capitalization of only $10 was evidence of insufficient capitalization). Because GSX Polymers was not organized to conduct remediation of Superfund sites, it was not required to be capitalized for that purpose. Additionally, as a corporation in the process of dissolution by definition does not expect to conduct further business operations, the need of capital, adequate or not, is irrelevant. Given the lack of any other evidence of inadequate capitalization, the Steering Committee has failed to sustain its burden of proof as to this factor.

The second factor requires extensive or pervasive control of the corporation by the shareholder, especially with regard to the corporation's daily operations. However, the Steering Committee presents no evidence that Laidlaw exercised any control over GSX Polymers' daily operations. Rather, the Steering Committee's argument on this point is limited to Laidlaw's role in the sale of GSX Polymers' assets and the subsequent winding up of GSX Polymers' business affairs. See Plaintiff's Memorandum at 55–56 ("Indeed, for five years following the asset sale, GSX Polymers had no independent existence apart from Laidlaw, and Laidlaw continued this corporation to further Laidlaw's own purpose."); Plaintiff's Response Memorandum at 31–32. However, given that GSX Polymers had no daily operations following the sale of its assets in 1987 and continuing through its corporate dissolution in 1992, this factor does not support piercing the corporate veil.

The third factor requires a showing that the corporation's properties or accounts were intermingled with those of its shareholder. The record is devoid of any evidence of co-mingling of GSX Polymers' with those of Laidlaw and the Steering Committee does not argue otherwise. The Steering Committee nevertheless maintains that Laidlaw and GSX Polymers shared the same building and suite as Laidlaw, 699 Airport Freeway, Suite 400, Hurst, Texas, as is evidenced by the address for GSX Polymers and Laidlaw appearing in the sale agreement for the Vicksburg plant. Plaintiff's Memorandum at 56; Plaintiff's Response Memorandum at 33. Defendants, however, maintain that while GSX Polymers was an active company, it always maintained separate office space, address and telephone number with its headquarters located in the Vicksburg plant. Defendants' Response Memorandum at 37 (citing Defs' Ex. 2 at 101–02 (Deposition Testimony of Fowler)). Furthermore, following the sale of its assets,

GSX Polymers' records were moved to a warehouse. *Id.* (citing Defs' Ex. 3 at 160 (Deposition Testimony of Whittaker)). Defendants further assert that insofar as the Steering Committee relies on the deposition testimony of Cairns and Whittaker as establishing the sharing of office space, Cairns and Whittaker's testimony is to the contrary. *Id.* (citing Defs. Ex. 1 at 236–37 (Cairns testifying that he was unaware whether GSX Polymers maintained a separate office after its assets were sold)), and Ex. 3 at 13 (Whittaker testifying that GSX Polymers' headquarters where its accounting and operations took place was located in Vicksburg, Mississippi). The record thus demonstrates that GSX Polymers maintained separate office space at least while it had active daily operations. That the sale agreement for GSX Polymers assets listed the same address for both corporations is consistent with the fact that following the asset sale, GSX Polymers would no longer maintain the Vicksburg office given that it would have no more call for accounting and daily business operations and only the business of winding down its affairs remained. The Steering Committee points to no authority requiring that a wholly-owned subsidiary maintain an office physically separate from its parent while its only operations were for the purpose of winding down its business affairs. Significantly, GSX Polymers had no employees after its assets were sold. Defendants' Memorandum at 38. This factor thus weighs against veil-piercing.

As to the fourth factor—the failure to observe corporate formalities and separateness—the Steering Committee asserts that after Laidlaw acquired GSX Polymers, Laidlaw installed its own officers and directors and GSX Polymers held no directors or officer's meetings. Plaintiff's Memorandum at 57 (citing Pl's Ex. 105 at 238 (Mr. Cairns testifying to his belief that GSX Polymer's corporate resolutions fulfilled meeting requirement); Ex. 106 at 78 (Laidlaw attorney Fowler testifying he was unaware whether GSX Polymers convened separate officers meeting)). Although Defendants do not deny this assertion, that the Steering Committee has established this single factor is not dispositive of the veil-piecing issue.

The fifth factor, pertaining to the siphoning of funds for the corporation, weighs against piercing the corporate veil. In particular, there is no evidence that GSX Polymers' corporate funds were routinely transferred to Laidlaw and the Steering Committee does not argue otherwise.

Nor is there any absence of corporate records for GSX Polymers, as required to establish the sixth factor. To the contrary, Defendants assert that GSX Polymers kept complete set of books separate from Laidlaw. Defendants' Memorandum at 33 (citing deposition testimony of Cairns, LaGrone and Whittaker). Accordingly, this factor weighs against piercing the corporate veil.

Finally, there is no evidence that GSX Polymers had nonfunctioning officers or directors as required by the seventh factor. With regard to this factor, the Steering Committee relies on declarations by former Laidlaw and GSX Polymers officers John Edward Fixari and Richard A. Norris in which they state they could not recall "actively perfoming any duties in their capacity as directors and officers of GSX Polymers." Plaintiff's Memorandum at 57 (citing Pl's Ex. 97, ¶¶ 15–20 (Declaration of Fixari—stating that despite documents identifying him as GSX Polymers' President, he does not recall performing any acts or functions as such nor holding such position)); and Pl's Ex. 98, ¶¶ 22–32 (Declaration of Norris—stating that despite documentation identifying him as GSX Polymers' Vice President of Financial Operations, he does not recall participat-

ing in that capacity in any formal meetings of GSX Polymers). However, attached to the Fixari Declaration is a document entitled "Annual Report and Certificate of Disclosure pertaining to GSX Polymers and indicating that Mr. Fixari assumed the position of GSX Polymers president on November 23, 1987. Similarly, a corporate resolution attached to Norris's Declaration establishes that Norris was elected to his GSX Polymers officer position on December 8, 1989, after the assets of GSX Polymers were sold and after the first dividend distribution. Ex. E to Pl's Ex. 98. Significantly, these documents demonstrate that Fixari and Norris were elected to their respective GSX Polymers officer position when little business remained in which they could be expected to participate. Moreover, although the record indicates that Laidlaw and GSX Polymers had substantially the same officers and directors, even a complete overlap of corporate directors does not require piercing the corporate veil. *See American Protein Corporation v. AB Volvo*, 844 F.2d 56, 60 (2d Cir.1988) (observing that fact that parent and subsidiary corporations share same board of directors, by itself, insufficient to warrant piecing the corporate veil and citing *Berger v. Columbia Broadcasting Sys.*, 453 F.2d 991, 995 (5th Cir.), *cert. denied*, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972)).

To summarize, the record presents no material issues of fact on this issue and the balance of the factors considered in the veil-piercing analysis reinforces the court's finding against piercing GSX Polymers' corporate veil. Accordingly, summary judgment as to the Steering Committee's veil piercing claim should be DENIED as to Plaintiff and GRANTED in favor of Defendants.

### CONCLUSION

Based on the foregoing, the record demonstrates that Plaintiff's motion for partial summary judgment should be GRANTED in part and DENIED in part and, Defendants' motion for summary judgment (Docket No. 191) should be GRANTED in part and DENIED in part. Specifically, summary judgment should (1) as to whether the record establishes Defendant GSX Polymers, Inc.'s predecessor, U.S. Rubber, deposited hazardous substances into the Landfill such that Defendants are subject to CERCLA generator liability, be GRANTED as to Plaintiff and DENIED as to Defendants; (2) as to Plaintiff's CERCLA contribution claim based on successor liability of Defendants, be GRANTED in favor of Plaintiff; (3) as to the imposition of a constructive trust upon Defendants as requested by Plaintiff in connection with the CERCLA contribution claim, be GRANTED in favor of Plaintiff; (4) as to Plaintiff's fraudulent conveyance claim, be GRANTED as to Defendants because the claim is time-barred or, alternatively, Plaintiff's constructive fraud claim should be GRANTED as to Plaintiff although the existence of material issues of fact preclude summary judgment on Plaintiff's actual fraud claim; and (5) as to Plaintiff's claim for piercing the corporate veil, be DENIED as to Plaintiff and GRANTED as to Defendants.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension*

184

*of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

SO ORDERED.

Aug. 12, 2002.